**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FORBES ENERGY SERVICES LTD., et al.,[1] | § | Case No. 17-20023 (DRJ) |
| | § | |
| Debtors. | § | Joint Administration Requested |
| | § | |

**DECLARATION OF L. MELVIN COOPER**
**IN SUPPORT OF FIRST DAY MOTIONS**

I, L. Melvin Cooper, hereby declare that the following is true and correct to the best of my knowledge, information, and belief.  I currently serve as the Senior Vice President and Chief Financial Officer of each of the above-captioned debtors (the "Debtors").  I submit this declaration (the "Declaration") in support of the petitions and "first day" motions and applications filed by the Debtors, which are described further below (collectively, the "First Day Motions").[2]

1.     Except as otherwise indicated, I have personal knowledge of the information contained herein, either directly or through employees of the Debtors, or the Debtors' other advisors, and am competent to testify as to the matters set forth herein.  Specifically, I have been directly involved in the matters leading up to these chapter 11 filings, including financial planning, forecasting, and the restructuring process.  I also have been directly

---

[1]  The Debtors, together with the last four digits of each Debtor's tax identification number, are:  Forbes Energy Services Ltd. (1100); Forbes Energy Services LLC (6176); C.C. Forbes, LLC (5695); TX Energy Services, LLC (5843); and Forbes Energy International, LLC (6617).  The location of the Debtors' headquarters and service address is 3000 South Business Highway 281, Alice, TX 78332.

[2]  Capitalized terms not defined herein have the meanings ascribed to them in the First Day Motions.

involved in the negotiations with key creditor constituencies described herein.  I am authorized to submit this declaration on behalf of the Debtors.

2.     I have served as Senior Vice President and Chief Financial Officer of each of the Debtors since 2008 and have been employed with the Debtors since 2007.  I have over thirty-three years of financial management experience.  My prior experience includes:  Senior Vice President and Chief Financial Officer of Cude Oilfield Contractors, Inc., a provider of oilfield construction and site preparation services, from January 2007 through June 2007; President of SpectraSource Company, a supplier of products and services to new home builders, from September 2004 to January 2007; President and Chief Executive Officer of Cerqa, a division of Nationwide Graphics, Inc., a supply chain management services company for technology customers, from April 2000 to September 2004; and Senior Vice President and Chief Financial Officer of Nationwide Graphics, Inc., the parent company of Cerqa, from January 1999 to April 2000.  I also currently serve on the Boards of Directors of:  Flotek Industries, Inc., a NYSE-listed company that provides specialty chemicals, downhole drilling tools, and artificial lift equipment to energy companies worldwide.  Par Pacific Holdings, Inc., a NYSE-listed company that manages and maintains interest in energy and infrastructure businesses, and SAExploration Holdings, Inc., as NASDAQ-listed company that offers vertically-integrated seismic data acquisition and logistical support services in remote and complex environments throughout Alaska, Canada, South America and Southeast Asia.  I received a Bachelor of Business Administration in accounting from Texas A&I University in 1975 and I am a certified public accountant.

3.     Part I of this Declaration describes the background of the Debtors and the developments that led to their filing for chapter 11 relief.  Part II of this Declaration sets forth the relevant facts supporting the First Day Motions filed concurrently herewith and incorporates by reference the facts of the other First Day Motions.

## PART I

### A.     The Debtors' Corporate Organization

4.     A corporate chart showing the Debtors is attached hereto as **Exhibit A**. Debtor Forbes Energy Services Ltd. ("FES Ltd.") was initially organized as a Bermuda company on April 9, 2008.  On August 12, 2011, FES Ltd. discontinued its existence as a Bermuda entity and converted into a Texas corporation.  FES Ltd. has been and is the holding company for all of the Debtors' operations.  Forbes Energy Services LLC, a Delaware limited liability company ("FES LLC"), is a wholly-owned subsidiary of FES Ltd. that acts as an intermediate holding company for the Debtors' wholly-owned operating companies:  C.C. Forbes, LLC, a Delaware limited liability company ("CCF"), TX Energy Services, LLC, a Delaware limited liability company ("TES"), and Forbes Energy International, LLC, a Delaware limited liability company ("FEI").  Effective July 1, 2015, the Debtors' former subsidiary, Superior Tubing Testers, LLC, merged with and into CCF.

### B.     Overview of the Circumstances Affecting the Oil and Gas Market

5.     Over the course of the last two years, the oil and gas industry has been adversely impacted by a severe and pervasive downturn in oil and commodities prices.  As such, the industry has experienced significant declines in oil exploration and production activities that

began in late 2014 and have continued to date.  This slump has caused dozens of companies

engaged in the oil and gas industry to commence chapter 11 proceedings, including several in

this District.  The financial slump in the oil and gas industry has particularly impacted the well

site and fluid logistic servicers, such as the Debtors, that depend on oil and natural gas producers

to whom these services are provided.

6.     Demand for well servicing, fluid logistics, and related services is generally

a function of the willingness of oil and natural gas companies to make operating and capital

expenditures to explore for, develop, and produce oil and natural gas, which in turn is affected by

current and anticipated levels of oil and natural gas prices.  Thus, as oil and gas exploration

companies reduce or altogether eliminate these operating and capital expenditures, the demand

for the Debtors' services is reduced or eliminated.   In addition to the decline in products and

services needed from the Debtors, the Debtors' customers have required price reductions, which

has further reduced margins.

## C.     Overview of the Debtors' Business

7.     The Debtors are a publicly-traded independent oilfield services business

that provides a wide range of well site services to oil and natural gas drilling and production

companies to help develop and enhance the production of oil and natural gas.  These services

include fluid hauling, fluid disposal, well maintenance, completion services, workovers, and

recompletions, plugging and abandonment, and tubing testing.  The Debtors' operations are

concentrated in the major onshore oil and natural gas producing regions of Texas, with an

additional location in Pennsylvania, which is currently used as a well service rig storage location.

4

Prior to its closure in August 2015, the Debtors had one location in Mississippi.  The Debtors believe that their broad range of services, which extends from initial drilling, through production, to eventual abandonment, is fundamental to establishing and maintaining the flow of oil and natural gas throughout the life cycle of customers' wells.

8.     The Debtors currently provide services to a diverse group of over 400 customers.  John E. Crisp and Charles C. Forbes, Jr., members of the Debtors' senior management team, have cultivated deep and ongoing relationships with customers during their average of over 39 years of experience in the oilfield services industry.  For the nine months ended September 30, 2016, the Debtors generated total revenues of approximately $88.2 million.

9.     The Debtors currently conduct operations through the following two business segments:

- *Well Servicing.*  The well servicing segment operated through Debtor CCF comprised 60.4% of the Debtors' total revenues for the nine months ended September 30, 2016.  At September 30, 2016, the Debtors' well servicing segment utilized a fleet of well servicing rigs comprised of 159 workover rigs and 14 swabbing rigs, six coiled tubing spreads, and related assets and equipment.  These assets are used to provide (a) well maintenance, including remedial repairs and removal and replacement of downhole production equipment, (b) well workovers, including significant downhole repairs, re-completions and re-perforations, (c) completion and swabbing activities, (d) plugging and abandonment services, and

5

(e) testing of oil and natural gas production tubing and scanning tubing for pitting and wall thickness using tubing testing units.

- *Fluid Logistics.* The fluid logistics segment operated through Debtor TES comprised 39.6% of the Debtors' total revenues for the nine months ended September 30, 2016. The Debtors' fluid logistics segment utilizes a fleet of owned or leased fluid transport trucks and related assets, including specialized vacuum, high-pressure pump and tank trucks, hot oil trucks, frac tanks, fluid mixing tanks, salt water disposal wells and facilities, and related equipment. These assets are used to provide, transport, store, and dispose of a variety of drilling and produced fluids used in, and generated by, oil and natural gas production. These services are required in most workover and completion projects and are routinely used in the daily operation of producing wells.

10.     The Debtors believe that their two business segments are complementary and create synergies in terms of selling opportunities. The Debtors' dual lines of service are designed to capitalize on their existing customer base to grow within existing markets, generate more business from existing customers, and increase operating performance. By offering customers the ability to reduce the number of vendors that they use, the Debtors believe that they can help improve their customers' efficiency, which is demonstrated by the fact that 75.5% of the Debtors' total revenues for the nine months ended September 30, 2016, were from customers that utilized services of both of the Debtors' business segments. Further, by having service

6

offerings that span the life cycle of the well, the Debtors believe that they have a competitive

advantage over smaller competitors offering more limited services.

**D.      Summary of the Debtors' Prepetition Debt**

11.      The Debtors are parties to certain financing arrangements, as summarized

below:

**(i)      Senior Secured Loan Agreement**

12.      Prior to the Petition Date, FES LLC, CCF, TES, FEI, as borrowers; FES

Ltd., as guarantor; Regions Bank, as agent and a lender; and certain other lenders thereto

(collectively, the "Senior Secured Lenders"), entered into that certain *Loan And Security*

*Agreement* dated September 9, 2011, as amended (the "Senior Secured Loan Agreement").  The

Senior Secured Loan Agreement provides for an asset-based revolving credit facility secured by

substantially all of the Debtors' assets.  As of the Petition Date, the Debtors' obligations under

the Senior Secured Loan Agreement totaled approximately $24.0 million, which is comprised of

$15.0 million in outstanding principal amounts of revolving advances and approximately $9.0

million in outstanding letters of credit, plus certain Bank Product Obligations (as that term is

used in the Senior Secured Loan Agreement), and any applicable accrued interest and fees.

**(ii)      Senior Unsecured Notes**

13.      Prior to the Petition Date, FES Ltd., as issuer; the remaining Debtors, as

guarantors; and Wells Fargo Bank, National Association, as indenture trustee, entered into an

*Indenture* dated as of June 7, 2011.  Pursuant to the Indenture, FES Ltd. issued 9% senior notes

due 2019 (the "Senior Unsecured Notes") to certain bondholders.  The Senior Unsecured Notes

are unsecured obligations of the Debtors that are *pari passu* with other unsecured debt.  As of the Petition Date, the Debtors' obligations under the Senior Unsecured Notes totaled $280.0 million in outstanding principal amounts, plus any applicable accrued interest and fees.  Due to the financial slump in the oil and gas industry and the ~~Debtors' constrained liquidity~~adverse impact to the Debtors' operations, the Debtors did not make the semi-annual interest payments on the Senior Unsecured Notes in the amount of $12,600,000 each that were due on June 15, 2016 and December 15, 2016, respectively.

   **(iii)**  **Other Prepetition Obligations**

   14.  The Debtors lease or finance certain personal property in the ordinary course of business.  The Debtors estimate that there are approximately $1.0 million to $1.5 million in outstanding capital lease obligations.

   15.  The Debtors also incur general unsecured trade debt in the ordinary course of business, which the Debtors intend to seek to continue to pay in the ordinary course.  The Debtors are the subject of various litigation claims, which are disputed and which claims have not yet been liquidated.  In addition, the Debtors may, in their discretion, move to reject certain executory contracts and/or unexpired leases pursuant to the Plan which may result in the assertion of rejection damage claims by the counterparties to such contracts and leases.

**E.**  **Commencement of These Chapter 11 Cases / Prepackaged Plan**

   16.  The Debtors filed these chapter 11 cases in order to effectuate an orderly restructuring of their capital structure.

17.     As noted above, the Debtors operate in an oil and gas industry that is generally depressed in the current environment.  Before the Petition Date, the shares of FES Ltd. traded on the OTC Pink Sheets after being delisted from the NASDAQ Capital Market on November 21, 2016.  As a publicly reporting entity, FES Ltd. released detailed information regarding the Debtors' financial condition, which reflects the Debtors' steadily declining revenues resulting from the slowdown in the oil and gas industry.  As reflected in FES Ltd.'s last Form 10-Q as of and for the period ended September 30, 2016, (i) well servicing revenues declined approximately $72,358,000, from $125,606,000 for the nine months ended September 30, 2015 to $53,248,000 for the nine months ended September 30, 2016; (ii) fluid logistics revenues declined approximately $42,143,000 from $77,094,000 for the nine months ended September 30, 2015 to $34,951,000 for the nine months ended September 30, 2016; and (iii) total revenues declined approximately $114,501,000 from $202,700,000 for the nine months ended September 30, 2015 to $88,199,000 for the nine months ended September 30, 2016.

18.     Between 2015 and 2016, the Debtors' customers significantly reduced their capital budgets, which caused drilling and production-related activity to substantially decline across most U.S. oil and gas regions.  As a result, lower demand for completions and production services has produced an environment among the Debtors' competitors of buying market share through unjustifiable pricing.  Such pricing pressure is expected to decline in the long term.  In light of current market conditions and operating results, the Debtors cannot continue to service their existing debt load, particularly with reference to the Senior Unsecured Notes, without jeopardizing their business.

19.     On July 19, 2016, it was publicly announced that the Debtors had entered into a (1) forbearance agreement and an amendment to the Senior Secured Loan Agreement with the Senior Secured Lenders and (2) forbearance agreement with respect to the interest payment on the Senior Unsecured Notes with holders of approximately 65.40% in principal amount of the Senior Unsecured Notes.  At that time, the Debtors commenced detailed discussions with a group of the largest holders of the Senior Unsecured Notes (the "Ad Hoc Group") regarding a capital restructuring.

20.     In the following months, the Debtors and the Ad Hoc Group worked diligently to negotiate an arm's length capital restructuring transaction that would ultimately provide substantial benefits to the Debtors' estates and allow for the Debtors to continue their businesses in an economically viable manner.  Specifically, the Ad Hoc Group agreed to exchange the Senior Unsecured Notes for equity, thus freeing the Debtors from the continued cash interest expense associated with the Senior Unsecured Notes and the ultimate need to repay the principal outstanding.  Second, despite significant efforts, the Debtors were unable to obtain exit financing from traditional lenders on terms that were economically viable for the Debtors.  Ultimately, the Ad Hoc Group agreed to backstop the funding of a $50 million exit facility that will allow the Debtors to fund necessary capital expenditures to grow their businesses and to satisfy the remaining projected obligations under the Debtors' business plan.  Without these concessions provided from the Ad Hoc Group, it is not clear that the Debtors would have been able to complete a successful restructuring.

21.     On December 21, 2016, the Debtors and the Ad Hoc Group entered into a *Restructuring Support Agreement*, which is attached hereto as **Exhibit B** (without exhibits).  The terms of the Restructuring Support Agreement are incorporated in the *Debtors' Prepackaged Joint Chapter 11 Plan of Reorganization* (the "Plan").  Pursuant to the Restructuring Support Agreement, the Debtors solicited votes on the Plan prior to the Petition Date beginning on December 22, 2016.

22.     Only the holders of the Senior Unsecured Notes Claims were entitled to vote on the Plan.  Holders of approximately 87.14% in principal amount of the Senior Unsecured Notes have voted in favor of the Plan.  Of the holders of Senior Unsecured Notes Claims who submitted ballots, approximately 99.46% in amount and approximately 93.75% in number voted to accept the Plan.

23.     The Plan will effectuate a debt-for-equity exchange of the Senior Unsecured Notes.  Specifically, holders of the Senior Unsecured Notes will be entitled to receive, on account of their respective prepetition unsecured claims, a *pro rata* share of 100% of the new common stock of the reorganized FES Ltd., subject to dilution by shares issued or available for issuance under a management incentive plan, and a *pro rata* share of $20 million.  The Debtors' secured prepetition obligations, including obligations under the Senior Secured Loan Agreement, either will be reinstated or paid under the Restructuring Support Agreement and the Plan.  Allowed general unsecured claims also will be paid in full.  The existing equity interests in FES Ltd. will be extinguished.

24.     The Plan will be implemented, in part, through the consummation of a first lien term loan facility in the aggregate principal amount of $50,000,000 (the "Exit Facility"). The lenders under the Exit Facility will be participating holders of the Senior Unsecured Notes. The Exit Facility will have a four-year maturity date and will accrue interest at the rate of 5.00% per annum, which shall be payable in cash, plus an additional 7.00% per annum, which shall be payable in cash or in-kind at the Debtors' option, *provided*, that the latter rate of interest shall increase by 2% per annum every 12 months.  The Exit Facility shall have a first lien on substantially all of the assets of the Debtors.

25.     All beneficial holders of the Senior Unsecured Notes that are accredited investors and own in excess of $5,600,000 of the Senior Unsecured Notes (*i.e.*, 2% of the Senior Unsecured Notes outstanding) (each, an "Eligible Offeree") shall have the opportunity to subscribe for such holder's pro rata portion of the Exit Facility.  On the Effective Date, the lenders under the Exit Facility will receive a fee, payable in cash, of $3,000,000 (the "Funding Fee").  The Funding Fee shall be payable in cash to each lender proportionally based on such lender's pro rata portion of the funded Exit Facility.

26.     On December 21, 2016, the Debtors and the certain large holders of the Senior Unsecured Notes consisting of Ascribe Capital LLC, Courage Capital Management, LLC; Pacific Investment Management Company LLC; Phoenix Investment Adviser LLC; and Solace Capital Partners, L.P. (together, the "Backstop Lenders"), executed the Backstop Agreement, which is attached hereto as **Exhibit C**, pursuant to which the Backstop Lenders agreed to backstop, subject to the terms thereof, the Exit Facility to ensure that the entire Exit Facility is

funded.  In consideration of such backstop commitment, on the effective date of the Plan, the Backstop Lenders shall receive a nonrefundable premium of $2,000,000 (the "Backstop Put Premium").  The Backstop Put Premium shall be payable to each Backstop Lender in cash proportionally based on such Backstop Lender's backstop commitment.

27.     The Plan further contemplates that, upon the effective date thereof, reorganized FES Ltd. will adopt and implement a management incentive plan, which will, subject to certain terms and conditions and as set forth in the Restructuring Support Agreement, provide for the issuance of shares of new common stock to the officers and other key employees of reorganized FES Ltd. in an amount equal to 12.2% of the aggregate equity in FES Ltd. (increasing ratably after the first 18 months following the effective date to 12.5% over the period that the Exit Facility is still outstanding).

28.     The Debtors intend to move promptly towards confirmation of the Plan, consistent with the terms of the Restructuring Support Agreement and the results of the prepetition solicitation process, and to exit bankruptcy as quickly as possible in order to minimize any potential adverse impact of the bankruptcy filing on the Debtors' business. Holders of approximately 87.14% in principal amount of the Senior Unsecured Notes have voted in favor of the Plan. The Plan is in the best interests of the Debtors' creditors and will maximize the value of these estates.

## PART II

### First Day Motions[3]

29.     In order to enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases, the Debtors have requested various types of relief in the First Day Motions filed concurrently with this Declaration.

30.     I have reviewed each of the First Day Motions (including the exhibits and schedules thereto), and I incorporate by reference the factual statements set forth therein.  The facts stated in the First Day Motions are true and correct to the best of my knowledge, information, and belief, and I believe that the type of relief sought in each of the First Day Motions is:  (a) necessary to enable the Debtors to operate under chapter 11 with minimal disruption; and (b) essential to maximizing the value of the Debtors' assets for the benefit of these estates.

31.     It is my further belief that, with respect to those First Day Motions requesting authority to pay prepetition claims or to continue selected prepetition programs, the relief requested is essential to the Debtors' efforts to preserve and maximize value in these cases and avoid immediate and irreparable harm to these estates.

32.     I believe that any diminution in the relief requested in the First Day Motions could have an immediate and irreparably harmful impact upon the value of these estates to the detriment of all of the Debtors' constituencies.  Specifically, the Debtors believe that payment of the prepetition claims identified in the First Day Motions will forestall such

---

[3] In this section, capitalized terms used but not otherwise defined have the meanings ascribed to them in the respective First Day Motions.

irreparable harm and that all creditors of the Debtors will ultimately benefit from the relief

requested therein.

**A.      Emergency Motion of the Debtors for Order Directing the
Joint Administration of Their Chapter 11 Cases and
(ii) Waiving Certain Requirements of 11 U.S.C. § 342(c)(1)
and Fed. R. Bankr. P. 1005 and 2002(n)  ("Joint Administration Motion")**

       33.     Pursuant to the Joint Administration Motion, the Debtors request entry of

an order directing the joint administration of these cases, for procedural purposes only.  Many of

the motions, applications, and other pleadings filed in these chapter 11 cases will relate to relief

sought jointly by all of the Debtors.  I believe that joint administration of the Debtors' chapter 11

cases, for procedural purposes only, under a single docket entry, will also ease the administrative

burdens on the Court by allowing the Debtors' cases to be administered as a single joint

proceeding instead of five independent chapter 11 cases.  Accordingly, on behalf of the Debtors,

I respectfully submit that the Joint Administration Motion should be approved.

**B.      Emergency Motion of Debtors for Entry of an Order (I) Authorizing the Debtors to
File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing
Matrix for Each Debtor and a Consolidated List of the 30 Largest Unsecured
Creditors, (II) Extending the Time and, Upon Plan Confirmation, Waiving the
Requirement to file Schedules and Statements of Financial Affairs and (III)
Granting Related Relief (the "Consolidated Matrix Motion")**

       34.     Pursuant to the Consolidated Matrix Motion, The Debtors seek entry of an

order authorizing the Debtors to file a consolidated creditor matrix and list of the 30 largest

unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each

Debtor; (b) extending the time for the Debtors to file schedules of assets and liabilities and

statements of financial affairs (collectively, the "Schedules and Statements") by 45 days, to

March 24, 2017, for a total of 60 days from the Petition Date (the "Deadline"), without prejudice

to the Debtors' right to request additional extensions should it become necessary; (c) waiving the requirement that the Debtors file the Schedules and Statements if confirmation occurs on or before the Deadline with such waiver effective as of the date the order confirming the proposed chapter 11 plan is entered; and (d) granting related relief.

35.     The Debtors submit that permitting them to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, is warranted. Maintaining a single consolidated list of creditors will benefit the Debtors and their estates by allowing the Debtors to more efficiently provide required notices to parties in interest and reduce the potential for duplicate mailings for creditors of more than one Debtor. Moreover, the requirement that each Debtor maintain a separate creditor matrix was implemented to provide parties with information that may be necessary in the event of conversion to chapter 7 liquidation. Because of the prepackaged nature of these chapter 11 cases and the Debtors' expectation that they will promptly emerge from chapter 11, this concern is not implicated.

36.     The extension of time to file the Schedules and Statements through and including the Deadline is necessary and appropriate under the circumstances of these prepackaged chapter 11 cases. First, the Debtors have many potential creditors, and the ordinary operation of the Debtors' businesses requires the Debtors to maintain voluminous books, records, and complex accounting systems. Accordingly, substantial time would be required for the Debtors to complete the Schedules and Statements. Second, no party in interest will be prejudiced by the Court granting the Debtors' request for an extension through and including the Deadline. Class 4 (Senior Unsecured Notes Claims) is the only class of claims entitled to vote

16

on the Plan, and, as noted earlier in my Declaration, has voted overwhelmingly to accept the Plan. All other creditors, including general unsecured creditors, are unimpaired under the Plan. Thus, all creditors holding allowed claims will be paid in full in the ordinary course of business pursuant to the Plan.

37.     A waiver of the requirement that the Debtors file the Schedules and Statements effective upon confirmation of the Plan, if confirmation occurs on or before the Deadline, is appropriate. As stated previously, the Debtors require time to prepare the Schedules and Statements. Indeed, the Debtors would expect to be in a position to file the Schedules and Statements near the time that the Debtors expect to confirm the Plan and emerge from chapter 11. Furthermore, no party in interest would be prejudiced if the requirement that the Debtors file the Schedules and Statements were waived. This is especially true in this case, in which the claims of all creditors are either unimpaired pursuant to the Plan, or voting creditors have already voted to accept the Plan, as is the case of Class 4 Senior Unsecured Notes Claims – the only class of claims entitled to vote on the Plan. Finally, preparing the Schedules and Statements would cause the Debtors to incur substantial expense and would burden the Debtors' employees at a time when such employees should be implementing or preparing to implement the restructuring. Accordingly, I respectively submit that the Consolidated Matrix Motion should be approved.

**C.     Emergency Motion of Debtors for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing; (II) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures; (III) Approving the Solicitation Procedures; (IV) Approving the Confirmation Hearing Notice; (V) Directing that a Meeting of Creditors Not be Convened; and (VI) <u>Granting Related Relief (the "Scheduling Motion")</u>**

38.     Pursuant to the Scheduling Motion, The Debtors seek entry of an order in the: (a) scheduling a combined hearing (the "Confirmation Hearing") on the adequacy of the Debtors' disclosure statement (as amended, supplemented, or otherwise modified from time to time, the "Disclosure Statement") and confirmation of the Plan, including, among other things, approval of the Restructuring Support Agreement and the Backstop Agreement; (b) establishing a deadline for objections to the adequacy of the Disclosure Statement and confirmation of the Plan (the "Objection Deadline") and approving related procedures; (c) establishing a deadline to file a brief in support of confirmation of the Plan and reply to any objections (the "Reply Deadline"); (d) approving the solicitation procedures regarding votes to accept the Plan (the "Solicitation Procedures"); (e) approving the form and manner of notice of the Confirmation Hearing (the "Notice"); (f) directing that the United States Trustee for the Southern District of Texas (the "U.S. Trustee") not convene a meeting of creditors (the "Creditors' Meeting") under section 341(e) of the Bankruptcy Code if the Plan is confirmed within 75 days of the Petition Date; and (g) allowing the notice periods for the Disclosure Statement and Confirmation Hearing to run simultaneously.

39.     In connection with the foregoing, the Debtors request that the Court approve the following schedule of proposed dates (the "Confirmation Schedule"):

| Event | Date[4] |
| --- | --- |
| Voting Record Date[5] | December 19, 2016 |

---

[4]  Certain of the proposed dates are subject to the Court's availability.

[5]  The "Voting Record Date" is the date as of which a holder of record of a claim entitled to vote on the Plan must have held such claim or interest to cast a vote to accept or reject the Plan and the date by which Eligible Offerees must have held their Senior Secured Notes in order to exercise their respective Subscription Option.

DOCS_SF:91174.11 28707/001

| | |
|---|---|
| Start of Solicitation | December 22, 2016 |
| Voting Deadline | January 18, 2017 |
| Petition Date | January 22, 2017 |
| Subscription Deadline | January 25, 2017 |
| Objection Deadline | February 27, 2017 |
| Reply Deadline | March 3, 2017 |
| Confirmation Hearing | March 6, 7, or 8, 2017 |

40.     The Debtors commenced their prepetition solicitation of holders of claims regarding the Plan on December 22, 2016 (the "Solicitation Commencement Date") in accordance with the solicitation procedures described below (the "Solicitation Procedures").  On the Solicitation Commencement Date, the Debtors caused their voting agent, Kurtzman Carson Consultants, LLC (the "Voting Agent"), to distribute packages containing the Disclosure Statement, the Plan and ballots (the "Solicitation Package") to the brokers, banks, dealers, agents, or other nominees (each of the forgoing, a "Nominee") for holders of Class 4 Senior Unsecured Notes Claims, as of the Voting Record Date, on behalf of the underlying beneficial holders of these securities (the "Beneficial Holders") with instructions to distribute Solicitation Packages to the respective Beneficial Holders within five (5) business days of receiving the Solicitation Packages.  The Voting Agent also separately distributed a subscription form to the Nominees for distribution to the Beneficial Holders in order to enable Eligible Offerees to exercise the Subscription Option prior the Subscription Deadline.

19

41.     Holders of claims that received the Solicitation Package were directed in the Disclosure Statement and ballots to follow the instructions contained in the ballots to complete and submit their respective ballots to cast a vote to accept or reject the Plan.  The Disclosure Statement and applicable ballot expressly provide that, in order for the vote of a Beneficial Holder to be counted, the Beneficial Holder needs to submit its beneficial ballot to its Nominee so that the Nominee can submit a master ballot reflecting such vote to the Voting Agent on or before the Voting Deadline.  Certain holders of claims and interests were not provided with a Solicitation Package because they are either:  (a) unimpaired under, and conclusively presumed to have accepted, the Plan under section 1126(f) of the Bankruptcy Code; or (b) impaired and not entitled to receive a distribution on account of such claims or interests under the Plan, and therefore deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

42.     The Debtors submit that the schedule proposed in the Scheduling Motion is in the best interests of the Debtors, their estates and stakeholders, as it will assist the Debtors in their efforts to efficiently and expeditiously exit chapter 11.  As I noted above, all holders of claims entitled to vote on the Plan were transmitted the Plan on or about December 22, 2016.  As clearly set forth in the Disclosure Statement and ballots, the Voting Deadline was January 18, 2017, which is 26 days after the date of the start of solicitation and distribution of the Plan and other solicitation materials.  Notably, the Debtors are not seeking to shorten time for the Confirmation Hearing.  As set forth earlier in my Declaration, the Plan was overwhelmingly accepted by the voting members of Class 4 Senior Unsecured Notes Claims.  Thus, I believe that

20

the proposed confirmation the Plan pursuant to the schedule summarized above (and also in the Scheduling Motion) is sufficient and in the best interest of the Debtors' estates.

**D.    Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief (the "Cash Collateral Motion")**

43.    Pursuant to the Cash Collateral Motion, the Debtors request entry of an interim order on an expedited basis (the "Interim Order") and following a final hearing to be set by the Court (the "Final Hearing"), entry of a final order (the "Final Order" and, with the Interim Order, the "Orders") (i) authorizing the Debtors to use cash collateral and the proceeds of all collateral pledged to Regions Bank ("Regions"), in its capacity as agent (in such capacity, together with its successors in such capacity, the "Agent") for itself and certain other financial institutions (collectively, with their respective successors and assigns, the "Secured Parties"), under that certain Loan and Security *Agreement* dated September 9, 2011, among the Debtors, the Agent, the lenders party thereto from time to time and certain other Secured Parties (as at any time amended or modified, and together with all exhibits, schedules and joinders thereto, the "Loan Agreement"); (ii) granting adequate protection to the Agent; (iii) modifying the automatic stay; and (iv) granting related relief.

44.    The Agent has consented to the relief requested in the Motion and entry of the Orders.

45.    Pursuant to the Cash Collateral Motion, the Debtors seek entry of an Interim Order that authorizes the Debtors to use Cash Collateral to provide adequate protection to the Secured Parties on the terms set forth in the Interim Order.   The Cash Collateral Motion

21

provides the required summary of the terms of the proposed use of Cash Collateral, including:
(a) the amount of Cash Collateral to be used; (b) the parties with an interest in the Cash
Collateral; (c) the use of Cash Collateral; (d) termination of the use of Cash Collateral; (e)
adequate protection liens; (f) adequate protection payments of fees and interests; (g) adequate
protection superpriority claim; (h) automatic perfection; (i) carve out (of which there is none); (j)
the Debtors' stipulations set forth in the Orders; (k) surcharge waiver; (l) events of
defaults/suspension; (m) stay termination; (n) miscellaneous provisions in the Orders; and (o)
immediate effectiveness of the Orders upon entry by the Court.

46.     The Debtors, with the assistance of their advisors, have developed a cash
flow forecast and Budget for the use of Cash Collateral pending consummation of the Plan.  The
Debtors believe that the Budget establishes that the Debtors will have adequate liquidity during
the period covered by the Orders.  The Budget contains line items for each category of cash
flows anticipated to be received or disbursed during the time period for which the Budget is
prepared.  The Debtors believe that the Budget includes all reasonable, necessary, and
foreseeable expenses to be incurred in connection with the operation of their business for the
period set forth in the Budget.

47.     Without the use of Cash Collateral as set forth in the Interim Order, the
Debtors would not be able to continue their going concern business operations and the Debtors'
reorganization efforts would be thwarted.  The Debtors require immediate access to Cash
Collateral in order to maintain their business operations pending confirmation of the Plan.
Without access to Cash Collateral, the Debtors will not have funding to satisfy their chapter 11

administrative obligations, including paying their employees, vendors, and other expenses

necessary to operate their business and administer these chapter 11 cases.  Absent access to Cash

Collateral to make the expenditures contemplated by the Budget, the Debtors would be required

to convert their cases to chapter 7 and liquidate on a piecemeal basis, causing irreparable harm to

the Debtors and their estates.  Accordingly, the Debtors have an urgent and immediate need for

Cash Collateral and entry of the Interim Order.

**E.     Emergency Motion of Debtors for Order Under Sections 105, 345, 363, 503(b), 1107 and 1108 of the Bankruptcy Code Authorizing (I) Maintenance of Existing Bank Accounts; (II) Continuance of Existing Cash Management System, Bank Accounts, Checks, and Related Business Forms; (III) Performance of Intercompany Transactions and Providing Administrative Priority Status to Postpetition Intercompany Claims; and (IV) Related Relief ("Cash Management Motion")**

48.     Pursuant to the Cash Management Motion, the Debtors request

authorization for the (i) maintenance of their existing bank accounts including the authority to

pay routine prepetition banking fees owed to financial institutions, (ii) continued use of their

existing Cash Management System, and (iii) continued performance of intercompany

transactions and provision of administrative priority to postpetition intercompany receivables,

among other relief requested.

49.     The Debtors' Cash Management System facilitates the timely and efficient

collection, management, and disbursement of funds used in the Debtors' business.  Because of

the nature of the Debtors' business and the disruption to operations that would result if the

Debtors were forced to close their existing bank accounts, it is critical that the existing Cash

Management System remain in place.  A schematic of the Cash Management System, along with

23

a listing of the Debtors' Bank Accounts is attached as Exhibit B to the Cash Management Motion.

50.     The Debtors' Bank Accounts are maintained at banking institutions that are FDIC-insured.  I am informed that Regions Bank and Wells Fargo are also authorized depositories by the U.S. Trustee in this District.[6]

51.     Prior to the Petition Date, the Debtors periodically would transfer funds amongst each other on an intercompany basis when necessary (collectively, the "Intercompany Transactions").  The Intercompany Transactions are recorded by each entity as intercompany payables or receivables, as applicable.  The Debtors seek the authority to continue these Intercompany Transactions in the ordinary course of business, consistent with the terms of the Cash Collateral Order.

52.     Throughout the reorganization process, it will be important that the Debtors are allowed to maintain their intercompany practices.  The Debtors maintain records of all Intercompany Transactions and will be able to ascertain, trace, and account for these post-petition Intercompany Transactions so that the income and expenses are properly allocated to the appropriate Debtor even though the disbursements are being made through a Bank Account held by a certain Debtor.  The Debtors, moreover, will continue to maintain such records, including records of all current intercompany accounts receivable and payable and such transactions will be consistent with the budgets attached to the Cash Collateral Order.

---

[6]  With respect to the account maintained at Texas Champion Bank (account ending in 0533), the Debtors do not maintain more than $75,000 in this account as of the Petition date.

53.     In the ordinary course of their business, the Debtors use a multitude of checks and other business forms.  By virtue of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services dealing with the Debtors on a regular basis, it is important that the Debtors be permitted to continue to use their existing checks and other business forms without alteration or change.  To avoid disruption of the Cash Management System and unnecessary expense, the Debtors request that they not be required to make reference to their status as debtors-in-possession on any business forms or checks.  Absent this relief, the estates will be required to bear potentially significant and unnecessary expenses, which the Debtors respectfully submit is unwarranted.

54.     The operation of the Debtors' business requires that the Cash Management System continues during the pendency of these cases.  Requiring each of the Debtors to adopt a new cash management system at this critical stage of these cases would be expensive, would create unnecessary administrative burdens and problems (including the possibility that transactions might not be adequately documented), and would likely disrupt and adversely impact the Debtors' ability to reorganize successfully.  Indeed, requiring changes to the Cash Management System could irreparably harm the Debtors, their estates and their creditors by creating cash flow interruptions while system was changed.  I believe that maintenance of the existing Cash Management System and granting the relief requested in the motion is therefore in the best interests of all creditors and other parties-in-interest.  Accordingly, I believe it is in the best interests of the Debtors' estates that the Cash Management Motion be granted.

**F.    Emergency Motion of Debtors for Entry of an Order
Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other
Compensation, and Reimbursable Expenses; (II) Continue Employee
Benefits Programs; (III) Granting Relief From the Automatic Stay to
Continue to Process, Administer and Adjudicate Workers' Compensation Claims;
and (IV) Granting Related Relief (the "Employee Wages and Benefits Motion")**

55.    Pursuant to the Employee Wages and Benefits Motion, the Debtors seek to (a) pay all prepetition and postpetition obligations on account of the Employee Compensation and Benefits  in the ordinary course of business and allow applicable banks and other financial institutions to receive, process, honor and pay certain checks and requests presented for payment and honor certain fund requests; (b) continue to administer the Employee Compensation and Benefits, including payment of prepetition obligations related thereto; (c) granting relief from the automatic stay to allow the Debtors to continue to process, administer, and adjudicate workers' compensation claims; and (d) granting related relief.

56.    The Debtors require immediate relief on this Motion because the vast majority of employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  Thus, Employees will be exposed to significant financial hardships if the Debtors are not permitted to continue paying their compensation, providing benefits, and maintaining existing programs. The Debtors' next payroll is due to be funded on the afternoon of this Wednesday, January 25, 2017 for the next bi-weekly payroll scheduled to be made this Friday, January 27, 2017.  Consequently, the relief requested is necessary and appropriate.

57.    The Debtors collectively employ approximately 835 Employees on an hourly and salaried basis.  All Employees are employed by FES LLC.

26

DOCS_SF:91174.11 28707/001

58.     The Debtors seek to minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected.  The Debtors are seeking authority to pay the Employee Compensation and Benefits.  The Debtors also seek to pay all costs incident to the Employee Compensation and Benefits.

59.     The Debtors seek authority, but not the obligation, to pay any unpaid prepetition amounts owed on account of the Employee Compensation and Benefits in their sole discretion.  Subject to the Court's approval of the relief requested in the Employee Wages and Benefits Motion, the Debtors intend to continue their prepetition Employee Compensation and Benefits program in the ordinary course of business on a postpetition basis and to pay prepetition amounts related thereto.  To the extent applicable, the Debtors also request authority to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

60.     As explained in the Employee Wages and Benefits Motion, Employee Compensation occurs in two separate cycles and consist of: (i) wages paid by the Debtors to their Employees, on a bi-weekly basis 26 times per year (the "Bi-Weekly Payroll"), and (ii) amounts paid to Employees, also on a bi-weekly basis 26 times per year, for payroll adjustments and certain other expenses not covered by the Bi-Weekly Payroll (the "Off Cycle Payroll").  In addition, the Debtors pay Employees amounts for car allowance payments, day rate and job completion amounts, and other related payments during the Off Cycle Payroll.

27

61.     On the Friday of each week, the Debtors will make either a Bi-Weekly Payroll or an Off Cycle Payroll distribution.  As I noted above, the next Bi-Weekly Payroll date is on January 27, 2017, and the next Off Cycle Payroll date is on February 3, 2017.  The Debtors need to fund their payroll no later than the afternoon of Wednesday, January 25, 2017 to ensure their Employees are timely paid.  Since the Debtors' Employees are all paid in arrears, the Debtors believe they will owe approximately Employee Compensation in the amount of $1,025,000 as of the Petition Date.  The Bi-Weekly Payroll and Off Cycle Payroll are each funded on the Tuesday prior to applicable Bi-Weekly Payroll or Off Cycle Payroll pay date, which, as noted above, each occur on the immediately following Friday.

62.     As of the Petition Date, the Debtors do not believe any Employee is owed Employee Compensation in excess of $12,850 and will not pay any Employee in excess of this amount on account of any unpaid prepetition wages.

63.     During each applicable pay period, the Debtors routinely make certain deductions from Employees' paychecks, including, without limitation, garnishments, levies, child support, and related fees, and pre-tax deductions payable pursuant to certain of the Health and Welfare Programs (the "Deductions").  As of the Petition Date, the Debtors believe that they will deduct approximately $232,000 in prepetition Deductions that have not been remitted to the applicable recipient.

64.     The Debtors also are required by law to withhold from Employees Compensation amounts relating to Employee Payroll Taxes for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll

28

Taxes from their own funds and pay, based upon a percentage of gross payroll, their Employer

Payroll Taxes.   The Employee Payroll Taxes and Employer Payroll Taxes (together, the "Payroll

Taxes") are generally processed and forwarded to the appropriate federal, state, or local taxing

authority at the same time Employees' payroll checks are disbursed on the applicable Friday Bi-

Weekly Payroll or Off-Cycle Payroll pay date.  As of the Petition Date, the Debtors estimate they

owe approximately $522,500 in unpaid prepetition Payroll Taxes.

      65.    As of the Petition Date, the Debtors estimate that the aggregate amount of

accrued Deductions and Payroll Taxes (together, the "Withholding Obligations") is

approximately $784,500.  The Debtors seek authority, but not the direction, to process any

unremitted prepetition Withholding Obligations to the appropriate parties and to continue to

remit the Withholding Obligations postpetition in the ordinary course of business. The Debtors

also reimburse Employees for Reimbursable Expenses, which are comprised of: (i) direct

reimbursement, the use of the Credit and Purchase Cards; and (iii) the use of the WEX Cards and

Fuel-IT Cards.  The Debtors request authority to reimburse their Employees for any prepetition

Reimbursable Expenses (which expenses were made on behalf of the Debtors) and to continue to

reimburse their Employees for Reimbursable Expenses in the ordinary course of business.

      66.    As more fully set forth in the Employee Wages and Benefits Motion, the

Debtors make various benefit plans available to their Employees, which include (a) the Health

Programs; (b) COBRA benefits; (c) the Medical Plans; (d) Dental Insurance; (e) Vision

Insurance; (f) Life Insurance Plans; (g) Employee Disability Plans; (h) the Group Accident

Insurance Plan; (i) benefits under the FMLA; (j) paid time off and holidays; (k) HSAs; (l) a

401(k) Plan; and (m) a Workers' Compensation Program.  Through the Employee Wages and

Benefits Motion, the Debtors seek authority to pay prepetition amounts under these benefit

programs and to continue to administer the programs posptetition, in the Debtors' discretion, in

the ordinary course of business.

   67. I believe that payment of the Employee Compensation and Benefits is

warranted under this authority and the facts of these chapter 11 cases. Employees will be

exposed to significant financial difficulties if the Debtors are not permitted to honor obligations

for unpaid Employee Compensation and Benefits.

   68. Moreover, Employees provide the Debtors with services necessary to

conduct the Debtors' businesses, and the Debtors believe that absent the payment of the

Employee Compensation and Benefits owed to the Employees, the Debtors may experience

Employee turnover and instability at this critical time in these chapter 11 cases. The Debtors

believe that without these payments, the Employees may become demoralized and unproductive

because of the potential significant financial strain and other hardships the Employees may face.

Such Employees may then elect to seek alternative employment opportunities. Additionally, a

significant portion of the value of the Debtors' business is tied to their workforce, which cannot

be replaced without significant efforts—which efforts may not be successful given the overhang

of these chapter 11 cases.  Enterprise value may be materially impaired to the detriment of all

stakeholders in such a scenario.  The Debtors therefore believe that payment of the prepetition

obligations with respect to the Employee Compensation and Benefits is a necessary and critical

element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood

of retention of their Employees as the Debtors seek to operate their businesses in these chapter

11 cases.  Accordingly, I believe that the Employee Wages and Benefits Motion should be

approved.

**G.**    **Emergency Motion of Debtors for Entry of an Order
(I) Approving the Debtors' Proposed Adequate Assurance of Payment for
Future Utility Services, (II) Prohibiting Utility Companies from Altering,
Refusing, or Discontinuing Services, and (iii) Approving the Debtors' Proposed
Procedures for Resolving Additional Assurance Requests ("Utility Motion")**

69.    Pursuant to the Utility Motion, the Debtors request entry of an order (a)

prohibiting the Utility Providers from altering, refusing or discontinuing service; (b) deeming the

Utility Providers adequately assured of future performance; and (c) establishing procedures for

determining additional adequate assurance of future payment.

70.    The Debtors receive essential utility services from a number of utility

companies.  In the normal course of their daily business operations, the Debtors have

relationships with various Utility Providers for the provision electricity, gas,

telecommunications, water, waste management (including sewer and trash), internet, cable, and

other similar services.

71.    Uninterrupted Utility Services are essential to the Debtors' ongoing

business operations, and hence the overall success of these chapter 11 cases.  The Debtors

provide well site services to oil and natural gas drilling and producing companies to help develop

and enhance the production of oil and natural gas.  These services include fluid hauling, fluid

disposal, well maintenance, completion services, workovers, and recompletions, plugging and

abandonment, and tubing testing. In addition to the midstream activities conducted in the field,

the Debtors operate corporate offices, as well as several regional and field offices responsible for

ensuring the smooth operation of the Debtors' businesses.  These offices require many of the

Utility Services for each of their locations.  Should any Utility Provider refuse or discontinue

service, even for a brief period, the Debtors' business operations would be severely disrupted,

and such disruption would jeopardize the Debtors' ability to manage their reorganization efforts.

Accordingly, it is essential that the Utility Services continue uninterrupted during the chapter 11

cases.  On average, the Debtors pay approximately $146,000 each month for the Utility Services,

calculated as a historical average payment for the twelve-month period from December 2015

through November 2016.  Based on the Debtors' historical average from September 2016

through November 2016 and projected utility use for the next month, the Debtors estimate that

their cost for Utility Services during the next 30 days (not including any deposits to be paid) may

be between $142,000 and $146,000.

72.     To provide additional assurance of payment, the Debtors propose to

deposit into a segregated account $73,000 (the "Adequate Assurance Deposit"), which represents

an amount equal to approximately one half of the Debtors' average monthly cost of Utility

Services, calculated based on the Debtors' average utility expenses over the twelve months from

December 2015 through November 2016.  The Adequate Assurance Deposit will be held in the

segregated account at Regions Bank for the benefit of the Utility Companies (the "Adequate

Assurance Account") and for the duration of the Debtors' chapter 11 cases and may be applied to

any postpetition defaults in payment to the Utility Companies.  The Adequate Assurance Deposit

will be held by the Debtors.  The Utility Motion contains additional procedures with respect to

32

the Adequate Assurance Account, Adequate Assurance Deposit, and related procedures with respect to the Utility Providers

73.     Therefore, I believe the relief requested in the Utility Motion is essential to the Debtors and their reorganization efforts.

**H.     Emergency Motion of Debtors for Entry of an Order
Authorizing the Debtors to Pay Certain Prepetition Claims
in the Ordinary Course of Business (the "Prepetition Claims Motion")**

74.     Under the Prepetition Claims Motion, The Debtors seek authority to pay allowed prepetition claims (collectively, the "Accounts Payable Claims") of certain (i) general unsecured creditors and (ii) creditors whose Accounts Payable Claims may give rise to liens under certain state and federal laws, that are not Debtors or "affiliates" (as such term is defined in section 101(2) of the Bankruptcy Code) of the Debtors (each, a "Creditor" and collectively, the "Creditors") in the ordinary course of business and (b) granting related relief.

75.     Additionally, the Debtors seek that the Orders: (a) provide that if a Creditor is subject to a prepetition contract with the Debtors ("Customary Terms"), the Debtors are authorized, but not directed, to condition payment of Accounts Payable Claims on a Creditor's maintenance or application, as applicable, of contractual terms during the pendency of these chapter 11 cases that are at least as favorable to the Debtors as those Customary Terms; and (b) require that if a Creditor, after receiving a payment under the Orders, ceases to provide Customary Terms, then the Debtors may, in their sole discretion, deem such payment to apply instead to any postpetition amount that may be owing to such Creditor or treat such payment as an avoidable postpetition transfer of property.

33

76.     The Creditors provide the Debtors with goods and services in the ordinary course of business, including, among other things, the Debtors' well site services to oil and natural gas drilling and producing companies that help develop and enhance the production of oil and natural gas.  Creditors also provide products and services related to the Debtors' business of fluid hauling, fluid disposal, well maintenance, completion services, workovers, and recompletions, plugging and abandonment, and tubing testing.  Correspondingly, the Debtors incur numerous fixed, liquidated, and undisputed payment obligations to the Creditors in the ordinary course of business that aggregated to approximately $4.5 million per month on average for the calendar year 2016, exclusive of settlements, rebates, and other non-ordinary course payables.

77.     The following table contains descriptions of the Accounts Payable Claims, the Debtors' estimate of the net amounts of the Accounts Payable Claims accrued as of the Petition Date, and, of those amounts, the net amounts that are due in the ordinary course of business within 21 days of the Petition Date.

| Category | Description | Approx. Amount Owed as of Petition Date | Approx. Amount Due Within 21 Days |
|---|---|---|---|
| **Well Servicing** | **Suppliers, service providers and other vendors relating to the Debtors' Well Serving and Coil Tubing business.  These vendors include equipment manufacturers, parts and service providers, contractors, Fuel providers, Tires, Uniforms, safety equipment, equipment lessors and others.** | **$1,750,000** | **$1,250,000** |
| **Fluid Logistics** | **Suppliers, service providers, and other vendors relating to the Debtors' fluid hauling, and disposal business.  These vendors include equipment manufacturers, parts and service providers, fluid disposal, third party salt water disposal wells, fluid** | **$2,500,000** | **$1,750,000** |

34

| Category | Description | Approx. Amount Owed as of Petition Date | Approx. Amount Due Within 21 Days |
|---|---|---|---|
| | providers, contractors, fuel providers, tires, uniforms, safety equipment, equipment lessors and others. | | |
| **Corporate Overhead (Legal, SG&A, Financial, Human Resources)** | **General corporate expenses including, office rent, professional fees for ordinary course professionals not otherwise employed in the Debtors' chapter 11 cases, marketing, information technology, other infrastructure costs, general operations and human resources services, labor relations and recruiting services, accounting, audit, tax, and other financial services** | **$250,000** | **$150,000** |

78.     The goal of the Debtors' prepackaged chapter 11 cases is to deleverage the Debtors' balance sheet with minimal interruption of business operations. Disrupting the flow of required goods and services upon which the Debtors rely would hamper the Debtors' ability to perform its well servicing and logistics services and possibly result in the termination of vendor and customer arrangements. To avoid this scenario, and in light of the fact that the treatment of the Accounts Payable Claims are unimpaired under the Plan, it is imperative that the Debtors maintain positive relationships with their suppliers that are essential to the Debtors' business operations during the duration of these chapter 11 cases. No party in interest will prejudiced by the relief requested in this Motion since, as noted above, the legal, equitable and contractual rights of the Creditors' claims are not altered under the Plan. Accordingly, the relief in the Motion furthers the Debtors' overarching restructuring goals and allows the payment of undisputed Accounts Payable Claims to be made in the ordinary course of business rather than delaying such payment until the effectiveness of the Plan. Accordingly, on behalf of the Debtors, I respectfully submit that the Prepetition Claims Motion should be approved.

**I.      Emergency Motion of Debtors for Entry of an Order
Authorizing the Payment of Certain Prepetition Taxes and Fees ("Tax Motion")**

79.      The Debtors collect, withhold, and incur property, franchise, excise, sales and use, and well servicing taxes, as well as business fees and taxes owing to governmental units (collectively, the "Taxes and Fees").  The Debtors remit the Taxes and Fees to various federal, state and local governments, including taxing and licensing authorities (collectively, the "Authorities").

80.      The Debtors remit and pay Taxes and Fees through checks and electronic funds transfers that are processed through their banks and other financial institutions. The Debtors estimate that approximately $525,000 in Taxes and Fees are accrued and unpaid as of the Petition Date.

81.      The Debtors believe that failing to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways. First, the Authorities could initiate audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from the reorganization process.  Second, failing to pay Taxes and Fees could subject certain of the Debtors' directors and officers to claims of personal liability, which likely would distract those key persons from their duties related to the Debtors' restructuring.  Third, failing to pay certain of the Taxes and Fees, particularly property taxes, likely could cause the Debtors to lose their ability to conduct business in certain jurisdictions.  Fourth, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtors' business.

82.     Accordingly, on behalf of the Debtors, I respectfully submit that the Tax Motion should be granted.

**J.     Emergency Motion of Debtors for Entry of Interim
and Final Orders Approving Notification and Hearing
Procedures for Certain Transfers of Common Stock and
Preferred Stock and Declarations of Worthlessness With
Respect to Common Stock (the "Stock Trading Motion")**

83.     Under the Stock Trading Motion, the Debtors seek entry of orders (a) approving certain notification and hearing procedures related to certain transfers of Debtor Forbes Energy Services Ltd.'s existing common stock and existing preferred stock or any Beneficial Ownership thereof (any such stock held of record of by Beneficial Ownership, respectively, the "Common Stock" and the "Preferred Stock"), as detailed in Exhibit 1 to the Order (the "Procedures"); (b) directing that any purchase, sale, or other transfer of Common Stock or any Preferred Stock in violation of the Procedures shall be null and void; and (c) granting related relief.  The Procedures are the mechanism by which the Debtors propose that they will monitor, and, if necessary, object to, certain transfers of Common Stock or any Preferred Stock, and declarations of worthlessness with respect to the Common Stock and any Preferred Stock to ensure preservation of the Tax Attributes.

84.     The Debtors estimate that, through December 31, 2016, they have generated NOLs totaling approximately $158.7 million (before application of $1.1 million reserve maintained by the Debtors with respect to certain workers compensation deductions).  In addition, the Debtors estimate as of September 30, 2016, they had alternative minimum tax credit carryforwards of approximately $1.2 million (the "AMT Credits") and $800,000 in foreign tax credits (the "Foreign Tax Credits" and together with NOLs, AMT Credits, and the Foreign Tax

Credits, the "Tax Attributes").  These NOLs and other Tax Attributes provide the potential for material future tax savings or other tax structuring possibilities in these chapter 11 cases.  The Tax Attributes are of significant value to the Debtors and their estates because the Debtors can carry forward their Tax Attributes to offset their future taxable income for up to 20 years (or approximately 10 years in the case of Foreign Tax Credits), thereby reducing  the Debtors' future aggregate tax obligations.  In addition, such Tax Attributes may be utilized by the Debtors to offset any taxable income generated by transactions consummated during these chapter 11 cases.  The value of the Tax Attributes will inure to the benefit of all of the Debtors' stakeholders.

85.     The Debtors believe that certain transfers of Common Stock and any Preferred Stock effected before the effective date of the Debtors' emergence from chapter 11 protection may trigger an "ownership change" for IRC purposes, severely endangering the Debtors' ability to utilize the Tax Attributes and causing substantial damage to the Debtors' estates.  The procedures proposed by the Stock Trading Motion will affect only (a) holders of the equivalent of 4.5% or more of outstanding Common Stock or Preferred Stock (b) parties who are interested in purchasing sufficient Common Stock or any Preferred Stock to result in such party becoming a holder of 4.5% or more of outstanding Common Stock or any Preferred Stock, and (c) any "50-percent shareholder" seeking to claim a worthless stock deduction.

86.     To maximize the use of the Tax Attributes and enhance recoveries for the Debtors' stakeholders, the Debtors seek limited relief that will enable them to establish Procedures to closely monitor certain transfers of Common Stock or Preferred Stock and claims of worthless stock deductions so as to be in a position to act expeditiously to prevent such

transfers or claims of worthless stock deductions, if necessary, with the purpose of preserving the

Tax Attributes.  By establishing and implementing such Procedures, the Debtors will be in a

position to object to "ownership changes" that threaten their ability to preserve the value of their

Tax Attributes for the benefit of the estates.

87.     Thus, I believe that the Stock Trading Motion is in the best interests of the

estates in order preserve the value of the Tax Attributes during these chapter 11 cases and should

be approved.

**K.     Emergency Motion of Debtors for Entry of an Order Authorizing the Debtors to (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto and (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; (III) Modify the Automatic Stay With Respect to the Workers' Compensation Program <u>and (IV) Continue the Surety Bond Program ("Insurance Financing Motion")</u>**

88.     Pursuant to the Insurance Financing Motion, the Debtors seek entry of an

order authorizing the Debtors to (a) continue existing insurance coverage entered into prepetition

and satisfy payment obligations related thereto, (b) renew, amend, supplement, extend, or

purchase insurance coverage in the ordinary course of business, (c) modify the automatic stay

with respect to the Debtors' workers' compensation program; and (d) continue the Debtors'

surety bond system.

89.     In the ordinary course of business, the Debtors maintain approximately

twenty Insurance Policies that are administered by the Insurance Carriers.  During the 12-month

period prior to the Petition Date, the Debtors paid aggregate annual premiums of approximately

$10.9 million for the Insurance Policies, plus applicable taxes, fees, and surcharges.  Some, but

not all, of the Insurance Policies are financed through the Premium Financing Agreement with

First Insurance Funding. Pursuant to the Premium Finance Agreement, the Debtors are required to make nine monthly premium payments of approximately $739,065 each, commencing on November 15, 2016. As of the Petition Date, the Debtors estimate they currently owe approximately $4,355,541 for the remaining term on the Premium Financing Agreement.

90. The Debtors request authority to continue to make payments owed to First Insurance Funding under the terms of the Premium Financing Agreement in the ordinary course of the Debtors' business and in the Debtors' discretion.

91. With respect to the Non-Financed Insurance Policies the Debtors prepay the entire annual premium for each of the Non-Financed Insurance Policies on or around the start date of each policy period. The Debtors estimate that, as of the Petition Date, no amounts are currently owed on account of the Non-Financed Insurance Policies.

92. Continuation of the Insurance Policies, the Premium Finance Agreement, and entry into new insurance policies, in the Debtors' ordinary course of business, is essential to the preservation of the value of the Debtors' business and operations. Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities. Accordingly, the Debtors request authority to maintain their existing Insurance Policies, pay prepetition obligations related thereto, continue to pay the obligations due under the Premium Finance Agreement, and enter into new insurance policies in the ordinary course of business on a post-petition basis, subject to applicable law.

93. In addition, the Debtors seek authority to continue to continue to assess, determine, and adjudicate Unpaid Workers' Compensation Claims during these chapter 11 cases

40

in connection with the Workers' Compensation Program. Thus, the Debtors request that the automatic stay be modified to allow them to continue to assess, determine and adjudicate Unpaid Worker's Compensation Claims in the ordinary course of the Debtors' business. In addition, to the extent any employees assert claims under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the employees to proceed with their claims under the Workers' Compensation Program.

94.     Under the Insurance Financing Motion, the Debtors also seek authority to honor any amounts owed to their insurance broker in the ordinary course of business on a postpetition basis to ensure uninterrupted coverage under the Insurance Policies.

95.     Finally, in order to continue their business operations during the reorganization process, the Debtors must be able to provide financial assurance to state governments, regulatory agencies, and other third parties. This, in turn, requires the Debtors to maintain the existing Surety Bond Program, including paying bond premiums as they come due, providing additional collateral, renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of business, and executing other agreements, as needed, in connection with the Surety Bond Program. As of the Petition Date, the Debtors do not believe that they owe any amounts to the Sureties on account of the annual premiums or any other prepetition obligations. Out of an abundance of caution, however, the Debtors seek authority, in their discretion, to honor any amounts owed to the Sureties to ensure the Surety Bond Program remains uninterrupted. Accordingly, I believe that it is in the best interests of the Debtors' estates to that the Insurance Financing Motion be granted.

**L.      Debtors' Emergency Application for Appointment of
          Kurtzman Carson Consultants LLC as Noticing, Balloting
          and Solicitation Agent *Nunc Pro Tunc* to the Petition
          Date ("Notice and Claims Agent Application")**

96.      Pursuant to the Notice and Claims Agent Application, the Debtors are

seeking authority to retain Kurtzman Carson Consultants LLC ("KCC") as noticing, balloting

and solicitation agent and to provide related services to the Debtors, effective as of the Petition

Date.  The Debtors require KCC to perform the following services, among others:  (i) serve as

the noticing agent to mail notices to the estates' creditors, equity security holders, and parties in

interest, (ii) provide computerized claims, objection, solicitation, and balloting database services,

and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other

administrative services with respect to the Debtors' bankruptcy cases. The Debtors submit that

KCC's rates are competitive and reasonable.  The Debtors  believe that there will be many

parties in interest that will be need to be noticed in these cases.  I submit that the appointment of

a claims and noticing agent will provide the most effective and efficient manner of noticing the

creditors and parties in interest of the filing of these cases and other developments in these cases.

Accordingly, I respectfully request that the Court authorize the Debtors to retain KCC.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22 day of January, 2017, at Alice, Texas.

L. Melvin Cooper

## EXHIBIT A

**Corporate Organizational Chart**

# ORGANIZATIONAL STRUCTURE OF THE DEBTORS



# EXHIBIT B

**Restructuring Support Agreement (without exhibits)**

[Exhibits to the Restructuring Support Agreement may be obtained by: (i) accessing the Debtors' restructuring website at http://www.kccllc.net/forbes; (ii) calling the Voting Agent at (877) 634-7165 (toll free) or +1 (424) 236-7221 (international); or (iii) emailing ForbesEnergyInfo@kccllc.com]

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement"), dated as of December 21, 2016, by and among (1) FORBES ENERGY SERVICES LTD., a Texas corporation ("FES"); FORBES ENERGY SERVICES LLC, a limited liability company formed under the laws of the State of Delaware, TX ENERGY SERVICES, LLC, a limited liability company formed under the laws of the State of Delaware; C.C. FORBES, LLC, a limited liability company formed under the laws of the State of Delaware; and FORBES ENERGY INTERNATIONAL, LLC, a limited liability company formed under the laws of the State of Delaware (collectively, the "FES Parties") and (2) the undersigned beneficial holders, or investment advisers or managers for the account of beneficial holders, of the 9% Senior Notes due 2019 (the "Notes") issued pursuant to that certain indenture dated as of June 7, 2011 (the "Indenture") by and among FES as Issuer, each of the guarantors named therein and Wells Fargo Bank, National Association, as trustee (the "Trustee"), together with their respective successors and permitted assigns that subsequently become party hereto in accordance with the terms hereof (each, a "Supporting Noteholder" and collectively, the "Supporting Noteholders").

Each of the FES Parties, the Supporting Noteholders and any subsequent Person that becomes a party hereto in accordance with the terms hereof is referred to herein as a "Party" and collectively as the "Parties."  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan (as defined herein).

## WHEREAS:

A.      The Parties have negotiated in good faith at arm's length and agreed to undertake a financial restructuring of the existing debt and equity interests of the FES Parties, to be implemented by each of the FES Parties commencing voluntary cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") through a pre-packaged chapter 11 plan of reorganization (including all exhibits thereto, the "Plan"), a copy of which is attached hereto as Exhibit A, all in accordance with the terms set forth in this Agreement and the Definitive Documents (as defined below) (the "Restructuring").

B.      As of the date hereof, the Supporting Noteholders, in the aggregate, beneficially own $183,107,000 (approximately 65.40%) of the aggregate outstanding principal amount of the Notes.

C.      The FES Parties and the lenders (collectively, the "ABL Lenders") party to that certain Loan and Security Agreement, dated September 9, 2011 (as amended, the "Loan Agreement"), have reached an agreement for the consensual use of "cash collateral" pursuant to the terms and conditions set forth in the interim and final orders approving, among other things, the FES Parties' use of cash collateral to be entered by the Bankruptcy Court (each, a "Cash Collateral Order") substantially in the form of the interim order attached hereto as Exhibit B or otherwise in form and substance mutually acceptable to the FES Parties, the ABL Lenders and the Required Supporting Noteholders (as defined below).

D.      In connection with the Restructuring, the Company intends to enter into a credit agreement for a new first lien term loan (the "Term Loan") in an aggregate principal amount of $50,000,000.

E.      In connection with the Restructuring, certain Supporting Noteholders (collectively, the "Backstop Parties") have agreed to backstop the funding of the Term Loan, subject to the terms and conditions set forth in a backstop agreement (the "Backstop Agreement"), a copy of which is attached hereto as Exhibit C.

F.      In connection with the Restructuring, the Company intends to offer the opportunity to fund the Term Loan (the "Funding Option") to certain holders of the Notes, subject to certain requirements, subject to the terms and conditions of the Backstop Agreement.

G.      Subject to the terms and conditions set forth in this Agreement, the Supporting Noteholders have agreed to support (i) the commencement of the Chapter 11 Cases to implement this Agreement and the Restructuring and (ii) confirmation of the Plan by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

1.      Definitions.  The following terms used in this Agreement shall have the following definitions:

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"Confirmation Hearing" means the hearing before the Bankruptcy Court on confirmation of the Plan.

"Corporate Governance Documents" means the principal corporate governance documents of the reorganized FES Parties, as applicable, including the articles of incorporation or certificates of formation, by-laws, and/or company agreements.

"Court Date" means any Business Day on which the Bankruptcy Court is open.

"Disclosure Statement" means, in respect of the Plan, the disclosure statement and all exhibits, schedules, supplements, modifications and amendments thereto.

"Effective Date" means the date on which the Plan becomes effective.

"Outside Date" means March 24, 2017.

"Person" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any legal entity or association.

2

"Petition Date" means the date the Chapter 11 Cases are commenced.

"Tax Authority" means the Internal Revenue Service and any state, local, or foreign government, agency or instrumentality, charged with the administration of any applicable law relating to Taxes.

"Tax" or "Taxes" means (a) all federal, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all income, gross receipts, escheat, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever imposed by a governmental authority; and (b) all interest, penalties, fines, additions to tax or additional amounts imposed by any Tax Authority in connection with any item described in clause (a).

2.      Exhibits Incorporated by Reference.  Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits.  Unless otherwise provided herein, in the event the terms and conditions set forth in the Plan and this Agreement are inconsistent, the terms and conditions contained in the Plan and the Definitive Documents shall govern.

3.      Effectiveness.  This Agreement shall become effective and binding upon each of the undersigned persons as of the date (the "Agreement Effective Date") when (a) the Parties have executed and delivered signed copies of this Agreement and (b) the FES Parties have received executed versions of this Agreement from the Supporting Noteholders (or advisors, nominees or investment managers for beneficial holder(s)) which represent a majority in aggregate principal amount of the Notes.

4.      Action, Consent or Approval of Supporting Noteholders.  For purposes of this Agreement, unless otherwise specified, where this Agreement provides for the action, consent, approval or waiver of the Supporting Noteholders collectively, such action, consent, approval or waiver shall be upon the agreement of Supporting Noteholders which beneficially own, in the aggregate, no less than $135,000,000 of the outstanding principal amount of the Notes (the "Required Supporting Noteholders").  The Required Supporting Noteholders shall instruct Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank"), in its capacity as counsel to the Supporting Noteholders, to communicate in writing to the FES Parties whether the Required Supporting Noteholders have agreed to any such action, consent, approval or waiver.

5.      Definitive Documents; Good Faith Cooperation; Further Assurances.  The "Definitive Documents" shall include all (a) documents implementing, achieving, and relating to the Restructuring, including, without limitation, the Plan, the Disclosure Statement (a copy of which is attached as Exhibit D), the Cash Collateral Order, the Backstop Agreement, the plan supplement and its exhibits, ballots and other solicitation materials in respect of the Plan (the "Solicitation Materials"), commitment agreements, exit financing agreements (including the Exit Facility Documents), collateral or other related documents, the organizational documents (including, without limitation, any Corporate Governance Documents), shareholder and member

3

related agreements, or other related transactional or corporate documents (including, without limitation, any agreements and documents described in the Plan and the exhibits thereto); (b) motions or pleadings seeking approval or confirmation of any of the foregoing transactional or corporate documents, including the motion or motions to approve the Disclosure Statement, confirm the Plan, approve the Cash Collateral Order and ratify the solicitation procedures, and the order or orders approving the Disclosure Statement, the Backstop Agreement, and the solicitation procedures and confirming the Plan (the "Confirmation Order").  The Definitive Documents, whether filed with the Bankruptcy Court or otherwise finalized, shall be consistent with this Agreement and the Plan and shall be acceptable to the FES Parties and the Required Supporting Noteholders, each acting reasonably; provided, that, the Plan, the Backstop Agreement, the Confirmation Order and the Disclosure Statement shall be in form and substance acceptable to the Required Supporting Noteholders in their sole discretion, it being understood that the form of the Plan, the Backstop Agreement, and the Disclosure Statement attached hereto as Exhibit A, Exhibit C and Exhibit D, respectively, are acceptable to the Required Supporting Noteholders.  Any amendments, modifications or supplements to the Definitive Documents, whether filed with the Bankruptcy Court or otherwise finalized, shall be consistent with this Agreement and the Plan in all respects, and in form and substance acceptable to the Required Supporting Noteholders, in their sole discretion.  Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to, the pursuit, approval, implementation and consummation of the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documents, including the scheduling of necessary hearings with the Bankruptcy Court. Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

6. Commitment of Supporting Noteholders.

(a) Voting, Support.  So long as this Agreement has not been terminated with respect to such Supporting Noteholder in accordance with the terms hereof, each Supporting Noteholder agrees that it shall, subject to the terms and conditions hereof:

(i) subject to the receipt by such Supporting Noteholder of the Disclosure Statement and Solicitation Materials, vote all of its Claims against the FES Parties (the "FES Claims") (or for which such Supporting Noteholder now or hereafter has voting control over) to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis following the commencement of the solicitation pursuant to the Solicitation Materials (the "Solicitation") and to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, not "opt out" of any releases under the Plan by timely delivering its duly executed and completed ballot or ballots indicating such election;

(ii) not (A) direct any administrative agent, collateral agent or indenture trustee (as applicable) to take any action inconsistent with such Supporting Noteholder's obligations under this Agreement and, if any applicable administrative agent, collateral

4

agent or indenture trustee takes any action inconsistent with such Supporting Noteholder's obligations under this Agreement, such Supporting Noteholder shall use its reasonable best efforts to request that such administrative agent, collateral agent or indenture trustee (as applicable) cease and refrain from taking any such action, (B) exercise any right or remedy for the enforcement, collection or recovery of any claim against the FES Parties except in a manner consistent with this Agreement, the Plan or the Definitive Documents, or (C) unless this Agreement, the Plan or the Definitive Documents have been amended in a manner adverse to a Supporting Noteholder without such Supporting Noteholders consent, amend, change or withdraw (or cause to be amended, changed or withdrawn) its vote to accept the Plan;

(iii)     not (A) object to, delay, impede or take any other action to interfere with, delay or postpone acceptance, confirmation or implementation of the Plan, (B) directly or indirectly solicit, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to section 363 of the Bankruptcy Code), merger, workout or plan of reorganization for any of the FES Parties other than the Plan or (C) otherwise take any action that would in any material respect interfere with, delay or postpone the consummation of the Restructuring;

(iv)     subject to Section 8(a)(i), waive (and does hereby waive) any default that exists or that might otherwise occur under the Indenture or the Notes by reason of any failure of the FES Parties to comply with the provisions of the Indenture or the Notes;

(v)     use good faith efforts to negotiate and document the Definitive Documents and take such actions it deems reasonable and appropriate to obtain Bankruptcy Court approval of the Restructuring; and

(vi)     execute and deliver any agreements reasonably required to effectuate and consummate the Restructuring.

(b)     Notwithstanding anything contained in this Agreement, neither a vote to accept the Plan by a Supporting Noteholder, nor the acceptance of the Plan by any class of creditors, shall in any way be deemed to impair or waive the rights of a Supporting Noteholder to assert or raise any objection otherwise permitted under Section 6(a) in connection with the Plan or the Chapter 11 Cases.

(c)     Transfers.

(i)     Each Supporting Noteholder agrees that, commencing on the Agreement Effective Date and ending on the Agreement Termination Date (as defined below), such Supporting Noteholder shall not (A) sell, transfer, assign, pledge, grant a participation interest in or otherwise dispose of, directly or indirectly, its right, title or interest in respect of any FES Claims, as applicable, in whole or in part, or (B) deposit any of such FES Claims against any FES Party, as applicable, into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such FES Claims (the actions described in clauses (A) and (B) are collectively referred to herein as a "Transfer" and the

5

Supporting Noteholder making such Transfer is referred to herein as the "Transferor"), unless such Transfer is to another Supporting Noteholder or the intended transferee (the "Transferee") first agrees in writing to be bound by the terms of this Agreement applicable to Supporting Noteholders by executing a Transferee Joinder Agreement substantially in the form attached hereto as Exhibit E (the "Transferee Joinder Agreement"), and delivering an executed copy thereof within two (2) Business Days following such execution, to (1) Pachulski Stang Ziehl & Jones LLP, counsel to the FES Parties and (2) Fried Frank, counsel to the Supporting Noteholders.  Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations and the Transferor shall have no liability arising from or related to the failure of the Transferee to comply with the terms and conditions of this Agreement. Any Transfer made in violation of this Section 6(c)(i) shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the FES Parties and/or any Supporting Noteholder, and shall not create any obligation or liability of any FES Party or any other Supporting Noteholder to the purported Transferee. Notwithstanding anything in this Agreement to the contrary and for the avoidance of doubt, if any Party executes and becomes bound by this Agreement solely as to a specific business unit or division, no affiliate of such Party or other business unit or division within any such Party shall be subject to this Agreement unless they separately execute this Agreement or a Transferee Joinder Agreement.

(ii)     Notwithstanding Section 6(c)(i), a Supporting Noteholder may Transfer any FES Claim to an entity that is acting in its capacity as a Qualified Marketmaker (as defined herein) (a "Qualified Transfer") without the requirement that the Qualified Marketmaker be or become a Supporting Noteholder, provided that such Qualified Transfer shall only be valid if the Qualified Marketmaker subsequently Transfers all right, title and interest in such FES Claim to a Transferee that is a Supporting Noteholder (or becomes a Supporting Noteholder at the time of the Transfer pursuant to a Transferee Joinder Agreement).  For purposes hereof, a "Qualified Marketmaker" shall mean an entity that (A) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers FES Claims (including debt securities or other debt) or enter with customers into long and short positions in Claims against the FES Parties (including debt securities or other debt), in its capacity as a dealer or market maker in such Claims and (B) is in fact regularly in the business of making a market in FES Claims against issuers or borrowers (including debt securities or other debt).

(d)     Additional Claims.  This Agreement shall in no way be construed to preclude the Supporting Noteholders from acquiring additional FES Claims, and each Supporting Noteholder agrees that if any Supporting Noteholder acquires additional FES Claims then such Claims shall be subject to this Agreement (including the obligations of the Supporting Noteholders under this Section 6).

6

(e)      Several Not Joint.  The agreements of the Supporting Noteholders in this Section 6 shall be solely on such Supporting Noteholder's own behalf and not on behalf of any other Supporting Noteholders and shall be several and not joint.

7.      Commitment of the FES Parties.  For so long as this Agreement has not been terminated in accordance with the terms hereof, each FES Party, jointly and severally, agrees, that such FES Party shall:

(a)      take reasonably necessary and proper actions and use reasonable best efforts to: (i) obtain orders of the Bankruptcy Court in respect of the Restructuring, including obtaining entry of the Cash Collateral Order and Confirmation Order; (ii) timely file a formal written response in opposition to any objection filed with the Bankruptcy Court by any person with respect to entry of the Cash Collateral Order and Confirmation Order; (iii) support and consummate the Restructuring in accordance with this Agreement, including the good faith negotiation, preparation and filing within the time frame provided herein or in the Definitive Documents; (iv) execute and deliver any other required agreements to effectuate and consummate the Restructuring; and (v) operate its business in the ordinary course, taking into account the Restructuring;

(b)      provide reasonably prompt written notice (in accordance with Section 31 hereof) to the Supporting Noteholders between the Agreement Effective Date and the Effective Date of (i) the occurrence, or failure to occur, of any event of which the FES Parties has actual knowledge which occurrence or failure would be likely to cause (A) any covenant of any FES Party contained in this Agreement not to be satisfied in any material respect or (B) any condition precedent contained in the Plan not to timely occur or become impossible to satisfy, (ii) receipt of any notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring, (iii) receipt of any notice from any governmental unit with jurisdiction in connection with this Agreement or the transactions contemplated by the Restructuring, (iv) receipt of any notice of any proceeding commenced, or, to the actual knowledge of the FES Parties, threatened against the FES Parties, relating to or involving or otherwise affecting in any material respect the transactions contemplated by the Restructuring, and (v) any failure of the FES Parties to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder;

(c)      act in good faith and use reasonable best efforts to support and complete successfully the Solicitation in accordance with the terms of this Agreement;

(d)      use reasonable best efforts to meet the milestones set forth in Section 8(a) of this Agreement;

(e)      not amend or modify, or file a pleading seeking authority to amend or modify, the Definitive Documents or the Restructuring in a manner that is materially inconsistent with this Agreement;

7

(f)     timely file a formal objection to any motion filed with the Bankruptcy Court seeking the entry of an order modifying or terminating the FES Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, directing the appointment of an examiner with expanded powers or a trustee, converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, dismissing the Chapter 11 Cases or for relief that (i) is inconsistent with this Agreement in any material respect or (ii) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring;

(g)     use reasonable best efforts to obtain any and all required regulatory approvals and third-party approvals of the Restructuring;

(h)     not take any actions inconsistent with, or that are intended or reasonably likely to interfere with, this Agreement, the Plan and the Restructuring;

(i)     not directly or indirectly seek or solicit any discussions relating to, or enter into any agreements relating to, any alternative proposal other than the Restructuring, nor shall any FES Party solicit or direct any person or entity to undertake any of the foregoing;

(j)     provide draft copies of all material motions or applications and other documents (including among others all "first day" and "second day" motions and orders, the Plan, the Disclosure Statement, the Solicitation Materials and any proposed amended version of the Plan or the Disclosure Statement, the Confirmation Order that any FES Party intends to file with the Bankruptcy Court to the Supporting Noteholders and Fried Frank, at least five (5) Business Days prior to the date when the applicable FES Party intends to file any such pleading or other document (provided, that if delivery of such motions, orders or materials (other than the Plan, the Disclosure Statement, the Solicitation Materials and the Confirmation Order) at least five (5) Business Days in advance is not reasonably practicable, such motion, order or material shall be delivered as soon as reasonably practicable prior to filing, but in no event later than three (3) Business Days in advance of any filing thereof) and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(k)     support and take all actions that are necessary and appropriate to facilitate approval of the Disclosure Statement, confirmation of the Plan and consummation of the Restructuring in accordance with, and within the time frames contemplated by, this Agreement (including within the deadlines set forth in Section 8(a));

(l)     pay the reasonable and documented fees and expenses of the Backstop Parties in the manner, and to the extent, provided for in the Backstop Agreement;

(m)     use good faith efforts to negotiate and document the Definitive Documents and take such actions it deems reasonable and appropriate to obtain Bankruptcy Court approval of the Restructuring; and

8

(n)      execute and deliver any agreements reasonably required to effectuate and consummate the Restructuring.

8.      <u>Termination</u>.

(a)      <u>Supporting Noteholder Termination</u>.  This Agreement shall automatically terminate one (1) Business Day following the delivery of written notice from the Required Supporting Noteholders to the other Parties (in accordance with <u>Section 31</u>), at any time after and during the continuance of any of the following:

(i)      Notwithstanding <u>Section 6(a)(iv)</u>, the occurrence of any default or event of default under the Indenture (other than under sections 4.23(d), 6.01(1), 6.01(8) or 6.01(9) of the Indenture, and any default or event of default resulting from the delay in the delivery of the officer's certificate required under section 4.06(b) of the Indenture for any default or event of default under sections 4.23(d), 6.01(1), 6.01(8) or 6.01(9) of the Indenture) or the Loan Agreement (other than any default or event of default under sections 10.6 and 10.8 of the Loan Agreement);

(ii)      the FES Parties shall have failed to commence the Solicitation on or before December 22, 2016;

(iii)      the Petition Date shall not have occurred on or before January 23, 2017;

(iv)      the FES Parties shall have failed to file the Plan and the Disclosure Statement on the Petition Date or within one (1) Business Day thereafter;

(v)      the Bankruptcy Court declines to approve the Restructuring Support Agreement and/or the Backstop Agreement at or before the time of entry of the Confirmation Order;

(vi)      the Disclosure Statement shall not have been approved by the Bankruptcy Court and the Confirmation Order shall not been entered by the Bankruptcy Court on or before March 9, 2017;

(vii)      the Definitive Documents are not in form and substance reasonably acceptable to the Required Supporting Noteholders on or prior to the commencement of the Confirmation Hearing;

(viii)      the FES Parties shall have withdrawn the Plan without the consent of the Required Supporting Noteholders;

(ix)      the FES Parties file, propound or otherwise support any plan of reorganization or restructuring transaction other than the Plan;

(x)      any FES Party files any motion or application seeking authority to sell all or a material portion of its assets;

9

(xi)     the termination of the consensual use of cash collateral as provided in the Cash Collateral Order;

(xii)    termination of the Backstop Agreement;

(xiii)   the amendment, modification of, or the filing of a pleading seeking to amend or modify, the Plan, the Disclosure Statement or any Definitive Documents, by the FES Parties, which amendment, modification or filing is materially inconsistent with this Agreement or the Definitive Documents in a manner that is not reasonably acceptable to the Required Supporting Noteholders, provided, that amendments or modifications to the Plan, the Disclosure Statement and the Confirmation Order must be acceptable to the Required Supporting Noteholders in their sole discretion;

(xiv)    the filing by the FES Parties of any motion or other request for relief seeking (A) voluntary dismissal of any of the Chapter 11 Cases, (B) conversion of any of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code, or (C) appointment of a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

(xv)     the entry of an order by the Bankruptcy Court or any other court with appropriate jurisdiction (A) dismissing any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (C) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code with respect to any of the Chapter 11 Cases, (D) making a finding of fraud, dishonesty, or material misconduct by any officer or director of the FES Parties or (E) that would have the effect of prohibiting consummation of the Restructuring;

(xvi)    the Bankruptcy Court entering an order avoiding, disallowing, subordinating or recharacterizing any Claim, lien, or interest held by any Supporting Noteholder arising under the Indenture;

(xvii)   a material breach by any of the FES Parties of any of the commitments, representations, warranties, or covenants of the FES Parties under this Agreement or the Definitive Documents, and any such breach by the FES Parties is not cured within five (5) Business Days after receipt of written notice and opportunity to cure, if such breach is curable, from the Required Supporting Noteholders;

(xviii)  any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing, or prohibiting the Restructuring in a manner that cannot be reasonably remedied by the FES Parties or the Supporting Noteholders;

(xix)    the Effective Date shall not have occurred by the Outside Date;

(xx)     the exclusive right of the FES Parties to file and solicit a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code shall have terminated; or

(xxi)   the filing of any motion or pleading by any of the FES Parties in the Chapter 11 Cases that is materially inconsistent with the terms and conditions of this Agreement or the Definitive Documents in a manner that is not reasonably acceptable to the Required Supporting Noteholders.

(b)   _FES Parties Termination._  This Agreement shall automatically terminate one (1) Business Day following the delivery of written notice from the FES Parties to the other Parties (in accordance with Section 31), at any time after and during the continuance of any of the following:

(i)   a material breach by any of the Supporting Noteholders of their obligations under this Agreement or the Definitive Documents, and any such breach by the Supporting Noteholders is not cured within five (5) Business Days after receipt of written notice and opportunity to cure, if such breach is curable, from the FES Parties, but only if the non-breaching Supporting Noteholders own less than 66.67% of the outstanding principal amount of the Notes;

(ii)   any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued an order making illegal or otherwise restricting, preventing, or prohibiting the Restructuring in a manner that cannot be reasonably remedied by the FES Parties or the Supporting Noteholders;

(iii)   the Effective Date shall not have occurred by the Outside Date; or

(iv)   the filing of any motion or pleading by any of the Supporting Noteholders in the Chapter 11 Cases that is materially inconsistent with the terms and conditions of this Agreement or the Definitive Documents in a manner that is not reasonably acceptable to the FES Parties.

(c)   _Mutual Termination._  This Agreement may be terminated by mutual written agreement of the FES Parties and the Required Supporting Noteholders upon the receipt of written notice delivered in accordance with Section 31.

(d)   _Individual Supporting Noteholder Termination_.  At 11:59 p.m. prevailing Eastern Time on the date that is 365 days after the Agreement Effective Date, each Supporting Noteholder may terminate this Agreement, solely as to such terminating Supporting Noteholder, by written notice to the FES Parties.

(e)   _Termination Upon Completion of the Restructuring_.  This Agreement shall terminate automatically upon the Effective Date.

(f)   _Effect of Termination._  No Party may terminate this Agreement if such Party failed to perform or comply in all material respects with the terms and conditions of this Agreement, and such failure to perform or comply caused, or resulted in, the occurrence of one or more acts that would otherwise permit termination by such Party as are specified herein.  The date on which termination of this Agreement as to a Party is effective in accordance with Section 8 shall be referred to as an "Agreement Termination Date."  Other than Section 16, Section 20,

11

Section 24, Section 26, Section 27, Section 28, Section 29, Section 30, Section 33 and Section 36, which shall survive termination of this Agreement, upon the termination of this Agreement in accordance with this Section 8, this Agreement shall become void and of no further force or effect with respect to any Party, and (i) except as otherwise provided in this Agreement, each Party shall be (A) immediately released from its respective liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement, (B) have no further rights, benefits or privileges hereunder, and (C) have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement; provided that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination, and (ii) the FES Parties shall immediately and without further notice withdraw the Plan and the Plan shall automatically be withdrawn and of no further force and effect.  Upon any such termination of this Agreement, any and all consents and ballots tendered by the Supporting Noteholders prior to such termination shall be deemed, for all purposes, automatically null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Plan, this Agreement or otherwise, and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the FES Parties allowing such change or resubmission), and the FES Parties shall not oppose any such change or resubmission.

   9. <u>Ownership of Claims</u>.  Each of the Supporting Noteholders represents and warrants (severally and not jointly) that:

     (a) as of the date of this Agreement, it is the beneficial owner of the principal amount of the FES Claims in connection with the Indenture, or is the nominee, investment manager or advisor for beneficial holders of such FES Claims, on such Supporting Noteholder's signature page to this Agreement (collectively, the "Noteholder Claims"); provided, that, such signature pages to this Agreement shall be disclosed only to the FES Parties and their legal counsel and financial advisors and the FES Parties agree (and agree to cause their legal counsel and financial advisors to maintain the confidentiality of such information) that, except for such disclosure as may be required by an order of the Bankruptcy Court in connection with the Chapter 11 Cases, such information shall be kept confidential in accordance with Section 33, and without limiting the foregoing, only redacted signature pages shall be filed with the Bankruptcy Court;

     (b) each nominee, investment manager or advisor acting on behalf of beneficial holders of the Notes represents and warrants to the FES Parties and the other Supporting Noteholders that it has the legal authority to so act and to bind the applicable beneficial holder; and

     (c) other than pursuant to this Agreement, such Noteholder Claims are free and clear of any equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition of any kind, that might adversely affect in any way such Supporting Noteholder's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

10.    <u>Claim Resolution Matters</u>.  Prior to the entry of the Confirmation Order, the FES Parties may enter into agreements with holders of Claims against the FES Parties (other than the Supporting Noteholders) relating to the allowance, estimation, validity, extent or priority of such claims, or the treatment and classification of such claims under the Plan with the consent of the Required Supporting Noteholders.  Notwithstanding the foregoing, the FES Parties shall not be required to obtain the consent of the Required Consenting Holders with respect to payment of (a) any trade payables and employee benefits and obligations which arise in the ordinary course of the FES Parties' business, (b) individual claims asserted in a liquidated amount of $100,000 or less, <u>provided</u>, that, payment of claims in excess of $2 million in the aggregate shall require the consent of the Required Supporting Noteholders, and (c) claims which the FES Parties are authorized to resolve or pay pursuant to the terms of any applicable first day order and such resolution or payment complies with the terms and limitations, if any, imposed on the FES Parties by such applicable order, <u>provided</u>, that in all cases, the FES Parties shall be required to obtain the consent of the Required Supporting Noteholders with regards to any settlement of claims with an affiliate of the FES Parties, the executive officers or directors of the FES Parties, or an affiliate of the executive officers or directors of the FES Parties.

11.    <u>Business Continuance; Access</u>.

(a)    Except as contemplated by this Agreement or with the prior written consent of the Required Supporting Noteholders, the FES Parties covenant and agree that, between the Agreement Effective Date and the Effective Date, the FES Parties shall operate their businesses in the ordinary course in a manner consistent with past practice in all material respects (other than any changes in operations (i) resulting from or relating to the filing or prosecution of the Chapter 11 Cases or (ii) imposed by the Bankruptcy Court).  Further, except as expressly contemplated by this Agreement and except for changes resulting from or relating to the filing and prosecution of the Chapter 11 Cases or imposed by the Bankruptcy Court, the FES Parties will continue (A) using commercially reasonable efforts to preserve the relationships with current customers, distributors, suppliers, vendors and others having business dealings with the FES Parties, including but not limited to the performance of all material obligations under any executory contracts which have not been rejected and compliance with historical billing practices, (B) maintaining and insuring their physical assets, properties and facilities in the current working order, condition and repair as of the date hereof (ordinary wear and tear excepted) and maintaining all existing insurance on the foregoing consistent with past practices, (C) not taking any action, or omitting to take any action, the intent of which is to cause the termination of their current executive officers (other than for cause) and (D) maintaining the FES Parties' books and records on a basis consistent with prior practice, including prior billing and collection practices.

(b)    Subject to the entry by any Supporting Noteholder and its advisors (each, a "<u>Representative</u>") into a confidentiality agreement reasonably acceptable to the FES Parties (provided, that, the FES Parties acknowledge and agree that the existing confidentiality agreements between the Supporting Noteholders, its advisors and the FES Parties are acceptable), at the reasonable request and upon reasonable notice of one or more such Supporting Noteholders or advisors, the FES Parties agree to respond to reasonable information requests from such Supporting Noteholders and their Representatives (each of whom shall be

13

bound by a confidentiality agreement in favor of the FES Parties), and provide reasonable access to the FES Parties' senior management personnel regarding the FES Parties' business, the Chapter 11 Cases, and the general status of ongoing operations, during normal business hours and at other reasonable times in a manner that does not unreasonably interfere with the normal business operations of the FES Parties.

      12.    <u>Representations</u>.

      (a)    Each Party represents to each other Party that, as of the date of this Agreement:

      (i)    such Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and has all requisite corporate, partnership, or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

      (ii)    the execution, delivery and performance of this Agreement by such Party does not and shall not (A) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its organizational documents or those of any of its subsidiaries (B) conflict with its organizational documents or (C) except for typical bankruptcy and reorganization-type default and notice provisions, conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligations to which it or any of its subsidiaries is a party;

      (iii)    the execution, delivery and performance by it of this Agreement, or effectuation of the Restructuring, does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, except such filing as may be necessary and/or required for disclosure by the Securities and Exchange Commission or pursuant to state securities or "blue sky" laws, and the approval, if necessary, by the Bankruptcy Court of the FES Parties' authority to enter into and implement this Agreement; and

      (iv)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, fraudulent transfer or other similar laws, both foreign and domestic, relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

      13.    <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring.

14.     <u>Complete Agreement</u>.  The Agreement (including any exhibits or schedules hereto including as actually executed) and the other agreements named herein constitute the entire agreement of the Parties with respect to the subject matter hereof, and cancel, merge and supersede all other prior or contemporaneous oral or written agreements, understandings, representations and warranties both written and oral, among the Parties, with respect to the subject matter hereof.  Each Party hereto agrees that, except for the representations and warranties contained in this Agreement, none of the Parties make any other representations or warranties, and each Party hereby disclaims any other representation or warranties, express or implied, or as to the accuracy or completeness of any information, made by, or made available by, itself or any of its representatives, with respect to, or in connection with, the negotiation, execution or delivery of this Agreement or the transactions contemplated by this Agreement, notwithstanding the delivery or disclosure to the other or the other's representatives of any documentation or other information with respect to any one or more of the foregoing.

15.     <u>Survival of Agreement</u>.  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning the Restructuring and in contemplation of possible Chapter 11 Cases to be filed by the FES Parties.

16.     <u>Federal Rule of Evidence 408</u>.  This Agreement and the Plan are part of a proposed settlement of a dispute among the Parties.  Regardless of whether or not the transactions contemplated herein are consummated, or whether or not an Agreement Termination Date has occurred, if applicable, subject to <u>Section 6(a)(iv)</u>, which shall not survive the Agreement Termination Date, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights or remedies and the Parties expressly reserve any and all of their respective rights and remedies.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

17.     <u>Impact of Appointment of Official Committee of Unsecured Creditors in the Chapter 11 Cases</u>.  Notwithstanding anything herein to the contrary, if any Supporting Noteholder is appointed to, and serves on, an official committee of unsecured creditors in the Chapter 11 Cases, then the terms of this Agreement shall not be construed to limit such Supporting Noteholder's exercise (in its discretion) of its fiduciary duties to any person arising from its service as a member of such committee, and any such exercise (in the sole discretion of such Supporting Noteholder) of such fiduciary duties, each in a manner consistent with this Agreement in all material respects, shall not be deemed to constitute a breach of the terms of this Agreement; <u>provided</u>, <u>however</u>, that, appointment of a Supporting Noteholder as a member of any such committee shall not relieve such Supporting Noteholder of its individual obligations to affirmatively support, and vote for, the Plan, on the terms and conditions set forth herein.

18.     <u>FES Party Fiduciary Duties</u>.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the FES Parties or any of their respective directors or officers (in such person's capacity as a director or officer) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with such person's fiduciary obligations under applicable law.

15

19.     <u>Representation by Counsel</u>.  Each Party hereto acknowledges that it has been represented by counsel (or had the opportunity to and waived its right to do so) in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party hereto with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto.  None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

20.     <u>Independent Due Diligence and Decision-Making</u>.  Each Supporting Noteholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions and prospects of the FES Parties.

21.     <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

22.     <u>Amendments</u>.  Except as otherwise provided herein, this Agreement may not be modified, amended or supplemented in any manner except in writing signed by (i) the FES Parties and (ii) the Required Supporting Noteholders; <u>provided</u>, that this <u>Section 22</u> and <u>Section 26</u> shall not be modified, amended or supplemented without the prior written consent of each Party; <u>provided</u>, further that any modification, amendment, or modification that is materially adverse to any Supporting Noteholder shall require the prior written consent of each Supporting Noteholder.

23.     <u>Headings</u>.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

24.     <u>Relationship Among Parties</u>.  Notwithstanding anything herein to the contrary, the duties and obligations of the Supporting Noteholders under this Agreement shall be several, not joint.  It is understood and agreed that any Supporting Noteholder may trade in the debt or equity securities of the FES Parties without the consent of the FES Parties or any Supporting Noteholder to the extent permitted by the applicable confidentiality agreement entered into by such Supporting Noteholder, subject to <u>Section 6(c)</u> of this Agreement.  No Party hereto shall have any responsibility for any such trading by any other entity by virtue of this Agreement.  No prior history, pattern or practice of sharing confidences among or between the Parties hereto shall in any way affect or negate this understanding and agreement.

25.     <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply

16

promptly with any of its obligations hereunder; provided, however, that, each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

26.     Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for the Southern District of New York, and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.  Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced by the FES Parties, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

27.     WAIVER OF TRIAL BY JURY.  EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHTS SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 27.

28.     Interpretation and Rules of Construction.  This Agreement is the product of negotiations among the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.  In addition, this Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.

29.     Tax Matters.  The FES Parties shall not, without the prior written consent of the Supporting Noteholders, take or fail to take any action, the taking or failure to take of which has

17

or will have material adverse tax consequences for the FES Parties or holders of Noteholder Claims; the foregoing such actions include, without limitation, (a) making any Tax election; (b) entering into any contract with respect to Taxes; (c) extending the statute of limitations in respect of any Taxes; or (d) settling any Tax claim or assessment.

        30.    <u>Indemnification</u>.

        (a)    Whether or not the Restructuring is consummated or this Agreement is terminated for any reason, the FES Parties (each individually, in such capacity, the "<u>Indemnifying Party</u>") shall indemnify and hold harmless the Supporting Noteholders and their successors and assigns, their respective affiliates and their affiliates' respective officers, directors, managing directors, employees, agents, members, partners, managers, advisors, controlling persons, attorneys, investment bankers and financial advisors (each acting in such capacity, an "<u>Indemnified Person</u>") from and against any and all losses, claims, damages, liabilities and reasonable fees and expenses, joint or several, to which any such Indemnified Person may become subject to the extent arising out of or in connection with (i) any third party claim, challenge, litigation, investigation or proceeding with respect to this Agreement, the Chapter 11 Cases, the Restructuring or the transactions contemplated hereby or thereby, or (ii) any breach by the FES Parties of this Agreement and to reimburse such Indemnified Persons for any reasonable legal or other reasonable out of pocket expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing (subject to the limitation in the parenthetical proviso in the second sentence of <u>Section 30(b)</u>); <u>provided</u>, that, the foregoing indemnification will not, as to any Indemnified Person, apply to losses, claims, damages, liabilities or expenses to the extent that they are finally judicially determined to have resulted from any breach of this Agreement by such Indemnified Person or bad faith, gross negligence or willful misconduct on the part of such Indemnified Person.  If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such loss, claim, damage, liability or expense in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.

        (b)    Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, litigation, investigation or proceeding relating to this Agreement, the Chapter 11 Cases, the Restructuring or any of the transactions contemplated hereby or thereby ("<u>Proceedings</u>"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; <u>provided</u>, that, the omission so to notify the Indemnifying Party will not relieve it from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure.  In case any such Proceedings are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Person; provided that if the defendants in any such Proceedings

18

include both such Indemnified Person and the Indemnifying Party and such Indemnified Person shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the Indemnifying Party, such Indemnified Persons shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Proceedings (provided, that, the FES Parties shall not be responsible for any legal fees or expenses related to more than one such separate counsel) on behalf of such Indemnified Person. Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election so to assume the defense of such Proceedings and approval by such Indemnified Person of counsel, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Proceedings), (ii) the Indemnifying Party shall not have employed counsel reasonably satisfactory to such Indemnified Person to represent such Indemnified Person within a reasonable time after notice of commencement of the Proceedings or (iii) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

(c)     The Indemnifying Party shall not be liable for any settlement of any Proceedings effected without its written consent (which consent shall not be unreasonably withheld or delayed). If any settlement of any Proceeding is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Proceedings, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with, and subject to the limitations of, the provisions of this Section 30. The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld or delayed), effect any settlement of any pending or threatened Proceedings in respect of which indemnity has been sought hereunder by such Indemnified Person unless such settlement (i) includes an unconditional release of such Indemnified Person in form and substance reasonably satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Proceedings and (ii) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

31.     Notices. All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by email, courier, by facsimile transmission or mailed (first class postage prepaid) to the parties at the following addresses, emails or facsimile numbers:

19

If to the FES Parties:

Forbes Energy Services Ltd.
3000 South Business Highway 28
Alice, TX 78333
Telephone: (361) 664-0549
Facsimile:  (361) 664-0599
Attention:  L. Melvin Cooper

with a copy to (which shall not constitute notice):

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, California 90067-4100
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
Attention:   Richard M. Pachulski, Esq.
             Ira D. Kharasch, Esq.

If to the Supporting Noteholders:

To each Supporting Noteholder at the address identified on the respective
signature page hereto

with a copy to (which shall not constitute notice):

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8000
Facsimile:  (212) 859-4000
Attention:   Brad Eric Scheler, Esq.
             Matthew Roose, Esq.

All notices, requests and other communications required or permitted to be given under the
provisions of this Agreement shall be deemed to have been given on the earlier of (i) the date
sent by facsimile or electronic mail if sent on a Business Day before 5:00 p.m. local time of the
recipient, and if not then on the next Business Day immediately thereafter, (ii) the date of
personal delivery, (iii) at the close of business on the third Business Day following the day when
placed in the mail, or (iv) the date set forth in the records of the commercial delivery service or
on the return receipt.

32.   <u>No Third-Party Beneficiaries</u>.  The terms and provisions of this Agreement are
intended solely for the benefit of the Parties hereto and their respective successors and permitted
assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any
other Person.

33.     <u>Public Disclosure</u>.  The FES Parties shall not (and shall cause each of its legal and financial advisors to not) (a) use the name of any Supporting Noteholder in any press release without such Supporting Noteholder's prior written consent or (b) disclose to any Person other than legal and financial advisors to the FES Parties (i) the principal amount or percentage of any Noteholder Claims held by any Supporting Noteholder or file such information with the Bankruptcy Court or any court of competent jurisdiction or (ii) the identity of any Supporting Noteholder without such Supporting Noteholder's prior written consent except as required by Bankruptcy Court order or other applicable law; <u>provided</u>, <u>however</u>, that, the FES Parties shall be permitted to disclose at any time the aggregate principal amount of and aggregate percentage of Noteholder Claims held by Supporting Noteholders and the contents of this Agreement, but not the principal amount of any Noteholder Claims held by any Supporting Noteholder in the Plan, the Disclosure Statement, the Definitive Documents and any filings by the FES Parties with the Bankruptcy Court or the Securities and Exchange Commission or as required by law or regulation.

34.     <u>No Waiver of Participation and Preservation of Rights</u>.  This Agreement and the Plan are part of a proposed settlement of disputes among the Parties.  Without limiting the foregoing sentence in any way, if the transactions contemplated by this Agreement or otherwise set forth in the Plan are not consummated as provided herein, (a) if an Agreement Termination Date occurs, or (b) if this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies, claims and interests.

35.     [Reserved].

36.     <u>Transaction Expenses</u>.

(a)     Subject to the professionals identified in <u>Section 36(b)</u> below providing invoices (without limiting the right of such professionals to redact privileged, confidential or sensitive information) to the FES Parties, whether or not the Restructuring or any of the transactions contemplated hereby are consummated, the FES Parties will reimburse or pay, as the case may be, all reasonable and documented fees and out of pocket expenses of the Supporting Noteholders and their professionals identified in <u>Section 36(b)</u> (i) incurred in connection with this Agreement and the Restructuring and their participation in the Chapter 11 Cases through the earlier to occur of (A) an Agreement Termination Date and (B) the Effective Date, and (ii) incurred in connection with the enforcement of any rights of any Supporting Noteholder under this Agreement and any document or instrument entered into in connection with this Agreement or the Restructuring (such fees and expenses, collectively, "<u>Transaction Expenses</u>").

(b)     The professionals for the Supporting Noteholders are (i) FTI Consulting, Inc., financial advisor to the Supporting Noteholders and (ii) Fried Frank and McKool Smith PC, the legal advisors to the Supporting Noteholders.

(c)     The obligations of the FES Parties under this <u>Section 36</u> are in addition to, and do not limit, their obligations to provide indemnification to each Indemnified Person pursuant to <u>Section 30</u>.

21

(d)     The FES Parties' agreement to reimburse or pay, as the case may be, the Transaction Expenses is an integral part of the transactions contemplated by this Agreement and, without such agreement, the Supporting Noteholders would not have entered into this Agreement, and upon entry of the Confirmation Order, the Transaction Expenses shall constitute an administrative expense of the FES Parties under sections 503(b) and 507 of the Bankruptcy Code.

37.     <u>No Solicitation</u>.  This Agreement is not intended to be, and each signatory to this Agreement acknowledges that this Agreement is not (a) an offer for the purchase, sale, exchange, hypothecation, or other transfer of securities for purposes of the Securities Act and the Securities Exchange Act of 1934, or (b) a solicitation of votes for the acceptance of a chapter 11 plan of reorganization (including the Plan) for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Solicitation of acceptance of the Restructuring will not be solicited from any holder of Notes until such holder has received the disclosures required under or otherwise in compliance with applicable law.

38.     <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed and delivered on the date first written above.

ISSUER:

**FORBES ENERGY SERVICES LTD.**

By: _L M Cooper_
Name: _L. MELVIN COOPER_
Title: _SVP & CFO_

GUARANTORS:

**FORBES ENERGY SERVICES LLC**

By: _L M Cooper_
Name: _L. MELVIN COOPER_
Title: _SVP & CFO_

**TX ENERGY SERVICES, LLC**

By: _L M Cooper_
Name: _L. MELVIN COOPER_
Title: _SVP & CFO_

**C.C. FORBES, LLC**

By: _L M Cooper_
Name: _L. MELVIN COOPER_
Title: _SVP & CFO_

**FORBES ENERGY INTERNATIONAL, LLC**

By: _L M Cooper_
Name: _L. MELVIN COOPER_
Title: _SVP & CFO_

[Signature Page to Restructuring Support Agreement (Forbes Energy Services)]

SUPPORTING NOTEHOLDER

**ASCRIBE III INVESTMENTS LLC**

By: _____
Name    Lawrence First
Title:    Chief Investment Officer

Aggregate Principal Amount of Notes Beneficially Owned:

[Signature Page to Restructuring Support Agreement (Forbes Energy Services)]

SUPPORTING NOTEHOLDER

**ASCRIBE II INVESTMENTS LLC**

By: _____
Name    Lawrence First
Title:    Chief Investment Officer

Aggregate Principal Amount of Notes Beneficially Owned:

[Signature Page to Restructuring Support Agreement (Forbes Energy Services)]

SUPPORTING NOTEHOLDER

**COURAGE CREDIT OPPORTUNITIES OFFSHORE MASTER FUND III, L.P.**

By: _____

Name _____ Thomas G. Milne _____

Title: _____ President _____

Courage Capital Management, LLC

Aggregate Principal Amount of Notes Beneficially Owned:

[Signature Page to Restructuring Support Agreement (Forbes Energy Services)]

SUPPORTING NOTEHOLDER

**COURAGE CREDIT OPPORTUNITIES ONSHORE FUND III, L.P.**

By: _____

Name: ~~_____~~ Thomas G. Milne

Title: ~~_____~~ President

~~Courage Capital Management, LLC~~

Aggregate Principal Amount of Notes Beneficially Owned:

[Signature Page to Restructuring Support Agreement (Forbes Energy Services)]

SUPPORTING NOTEHOLDER

**PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, as investment manager for various funds and accounts**



By:_____

Name:  Alfred Murata
Title:    Managing Director

Aggregate Principal Amount of Notes Beneficially Owned:

[Signature Page to Restructuring Support Agreement (Forbes Energy Services)]

SUPPORTING NOTEHOLDER

**JLP CREDIT OPPORTUNITY MASTER FUND LTD**

By:_____

Name: Jeffrey Peskind

Title: CEO, Phoenix Investment Adviser LLC, Investment Manager

Aggregate Principal Amount of Notes Beneficially Owned:

SUPPORTING NOTEHOLDER

**JLP CREDIT OPPORTUNITY IDF SERIES INTERESTS OF THE SALI MULTI-SERIES FUND, L.P.**

By:_____

Name: Jeffrey Peskind

Title: CEO, Phoenix Investment Adviser LLC, Investment Subadviser

Aggregate Principal Amount of Notes Beneficially Owned:

[Signature Page to Restructuring Support Agreement (Forbes Energy Services)]

SUPPORTING NOTEHOLDER

**MERCER QIF FUND PLC – MERCER INVESTMENT FUND 1**

By:_____

By:_____

Name: Jeffrey Peskind

Title: CEO, Phoenix Investment Adviser LLC, Investment Sub-Investment Manager

Aggregate Principal Amount of Notes Beneficially Owned:

[Signature Page to Restructuring Support Agreement (Forbes Energy Services)]

SUPPORTING NOTEHOLDER

**GATEWAY SECURITIES HOLDINGS, LLC**
**By: Solace Capital Partners, L.P., its Manager**

By: _____

Name   NAEEM   ARASTU

Title:   SENIOR VICE PRESIDENT

Aggregate Principal Amount of Notes Beneficially Owned:

# **EXHIBIT C**

**Backstop Agreement**

BACKSTOP AGREEMENT

AMONG

FORBES ENERGY SERVICES LTD.

AND

CERTAIN LENDERS

_____

Dated as of December 21, 2016

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 1. | The Funding Option | 2 |
| 2. | Put Option. | 3 |
| 3. | Funding Fee | 4 |
| 4. | The Backstop Lenders' Commitments | 4 |
| 5. | The Company's Commitments | 5 |
| 6. | Backstop Lender Replacement Backstop | 5 |
| 7. | Representations and Warranties of the Company | 6 |
| 8. | Representations and Warranties of the Backstop Lenders | 13 |
| 9. | Additional Covenants of the Company | 13 |
| 10. | Additional Covenant of the Backstop Lenders: Approvals | 15 |
| 11. | Conditions to the Obligations of the Backstop Lenders | 16 |
| 12. | Conditions to the Obligations of the Company | 17 |
| 13. | Survival of Representations and Warranties | 18 |
| 14. | Termination | 18 |
| 15. | Indemnification Obligations | 20 |
| 16. | Notices | 23 |
| 17. | Survival | 24 |
| 18. | Assignment; Third Party Beneficiaries | 24 |
| 19. | Complete Agreement | 25 |
| 20. | Governing Law; Submission to Jurisdiction; Selection of Forum; Waiver of Trial by Jury | 25 |
| 21. | Counterparts | 25 |
| 22. | Action by, or Consent or Approval of, the Backstop Lenders | 25 |
| 23. | Amendments and Waivers | 26 |
| 24. | Specific Performance | 26 |
| 25. | Other Interpretive Matters | 26 |

## INDEX OF DEFINED TERMS

Agreement....................................................... 1
Backstop Commitments............................. 4
Backstop Lenders...................................... 1
Backstop Premium ..................................... 5
Bankruptcy Code ....................................... 1
Bankruptcy Court....................................... 1
Business Day.............................................. 2
Chapter 11 Cases....................................... 1
Company .................................................... 1
Company Replacement Notice .................. 5
Confirmation Date ................................... 18
Confirmation Order.................................... 1
Credit Agreement....................................... 1
Debtors....................................................... 1
Defaulting Lender ...................................... 5
Disclosure Statement .............................. 13
Environmental Law..................................... 9
Exchange Act ............................................. 8
Exchange Act Documents........................... 8
Final Replacement Notice........................... 6
Funding Price ............................................. 1
Hazardous Materials .................................. 9
HSR Act .................................................... 14
Indemnified Claim ................................... 21
Indemnified Person .................................. 20
Intellectual Property Rights ..................... 10
Lender Default ........................................... 5

Lender Percentages .................................... 1
Lender Replacement ................................... 6
Lender Replacement Funds........................ 6
Lender Replacement Notice....................... 5
Lender Termination ................................... 5
Losses ...................................................... 21
Material Adverse Effect ............................ 7
Outside Date............................................ 18
Participating Lender................................... 6
Petition Date.............................................. 1
Plan ........................................................... 1
Plan Effective Date ................................... 1
Purchase Notice ........................................ 4
Put Option ................................................. 3
Put Option Exercise Period....................... 3
Replacement Right..................................... 5
Requisite Lenders...................................... 2
Restructuring Support Agreement ............. 1
Rights Expiration Time.............................. 2
Satisfaction Notice .................................... 4
Subscription Agent.................................... 2
Subscription Documents ........................... 3
Taxes ...................................................... 11
Terminating Lender ................................... 5
Termination Fee ...................................... 20
Transaction Expenses................................ 5
Unsubscribed Term Loan........................... 1

BACKSTOP AGREEMENT

BACKSTOP AGREEMENT (the "***Agreement***"), dated as of December 21, 2016, among Forbes Energy Services Ltd., a Texas corporation (the "***Company***"), and each of the undersigned parties identified on the signature pages hereto (each, a "***Backstop Lender***" and collectively, the "***Backstop Lenders***").  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement (as defined below).

WHEREAS, the Company and certain of its subsidiaries (collectively, the "***Debtors***") will file voluntary petitions for relief (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***") before the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") (the date of such filings being referred to herein as the "***Petition Date***");

WHEREAS, certain creditors of the Company have entered into a Restructuring Support Agreement, dated as of the date hereof (the "***Restructuring Support Agreement***"), pursuant to which such creditors have agreed to, among other things, vote in favor of the pre-packaged plan of reorganization, to be filed in connection with the Debtors' Chapter 11 Cases, and attached as Exhibit A to the Restructuring Support Agreement (the "***Plan***").

WHEREAS, subject to the Bankruptcy Court's entry of an order confirming the Plan (the "***Confirmation Order***"), consummation of the Plan, and the other conditions specified in Section 11 and Section 12, the Company proposes to enter into a credit agreement (the "***Credit Agreement***") for a new first lien term loan (the "***Term Loan***") in an aggregate amount of $50,000,000 (the "***Term Loan Amount***");

WHEREAS, subject to the Bankruptcy Court's entry of the Confirmation Order, consummation of the Plan, and the other conditions specified in Section 11 and Section 12, the Company proposes to offer to each holder of a Noteholder Claim (the "***Note Claims***") who is an accredited investor and, together with its respective affiliates, owns in excess of $5,600,000 or 2% of the outstanding principal amount of the Notes (each, an "***Eligible Offeree***," and collectively, the "***Eligible Offerees***") the option to fund (the "***Funding Option***") such Eligible Offeree's *pro rata* portion of the Term Loan;

WHEREAS, in order to facilitate the Funding Option, pursuant to this Agreement, and subject to the terms, conditions and limitations set forth herein, (A) each Backstop Lender, severally and not jointly, has agreed to (i) fund (the "***Backstop Lenders' Commitments***"), on the effective date of the Plan (the "***Plan Effective Date***"), such Backstop Lender's percentage, as set forth on Exhibit A (the "***Backstop Lender Percentages***"), of the aggregate principal amount of the Term Loan minus the aggregate principal amount of Term Loan funded pursuant to the Funding Option on or before the Expiration Time (as hereinafter defined) (such remaining Term Loan, in the aggregate, the "***Unsubscribed Term Loan***") and (ii) sell its Put Option (as defined below) to the Company, and (B) the Company agrees to (i) acquire a Put Option from each Backstop Lender and (ii) in consideration for the Backstop Commitments (as defined below), pay the Backstop Put Premium (as defined below) to the Backstop Lenders on the Plan Effective Date;

WHEREAS, the Company will conduct the Funding Option pursuant to the Plan and consistent with the terms of this Agreement; and

WHEREAS, for purposes of this Agreement, the "***Requisite Backstop Lenders***" shall mean those Backstop Lenders holding a majority of the Backstop Commitments (as set forth on Exhibit A) held by all Backstop Lenders.

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties and covenants set forth herein, and other good and valuable consideration, the Company and the Backstop Lenders agree as follows:

1.   **The Funding Option**.  The Funding Option will be conducted as follows:

(a)   Subject to the terms and conditions of this Agreement, the Company hereby determines to offer each Eligible Offeree, as of a record date to be determined by the Company, the opportunity to participate in and fund the Term Loan by committing to and lending a portion of the entire amount of the Term Loan, in each case equal to each Eligible Offeree's *pro rata* portion of the Term Loan.

(b)   Each Eligible Offeree will be provided with a subscription form (a "***Subscription Form***", a form of which is attached hereto as Exhibit B) which shall include the ability to participate in a subscription option (the "***Subscription Option***").

(c)   Pursuant to the Subscription Option, each Eligible Offeree shall have the option to fund all, but not less than all, of its *pro rata* portion of the Term Loan.  For purposes of this Section 1(c), "***pro rata***" shall equal a fraction the numerator of which is the principal amount of Notes held by an Eligible Offeree and the denominator of which is the aggregate principal amount of all outstanding Notes.

(d)   [Reserved].

(e)   [Reserved].

(f)   The Company will provide, or cause to be provided, to each Eligible Offeree a Subscription Form, whereby each Eligible Offeree may exercise its Subscription Option.  The Subscription Option may be exercised during a specified period, which period will commence on the date the Subscription Forms are distributed and will end at the Expiration Time.  For purposes of this Agreement, the "***Expiration Time***" means 5:00 p.m. New York City time on such date that the Company, subject to the approval of the Requisite Backstop Lenders, may specify in a notice provided to the Eligible Offerees.  For purposes of this Agreement, "***Business Day***" means any day of the year on which national banking institutions in New York City are open to the public for conducting business and are not required or authorized to close.  In order to exercise a Subscription Option, each Eligible Offeree shall, prior to the Expiration Time, (i) return a duly executed Subscription Form to the subscription agent for the Funding Option selected by the Company (the "***Subscription Agent***"); (ii) return a duly executed signature page to the Credit Agreement, (iii) return a duly completed and executed administrative agent questionnaire, (iv) return a duly executed certificate of Eligible

2

Offeree, which shall include a certification that the Eligible Offeree is an accredited investor ((i)-(iv) collectively, together with the Subscription Form, referred to as the "***Subscription Documents***"); and (v) fund an amount equal to the portion of the Term Loan elected to be funded by such Eligible Offeree pursuant to their Subscription Option (net of fees), by wire transfer of immediately available funds prior to the Expiration Time to an account established by the Subscription Agent for the Funding Option.

(g)     The portion of Term Loan funded by an Eligible Offeree who elects to fund such Term Loan shall be rounded down to the nearest ten thousand dollar increment.

(h)     If the Subscription Agent for any reason does not receive from an Eligible Offeree both a timely and duly executed Subscription Documents and timely payment for the Term Loan being funded by such Eligible Offeree, unless otherwise approved by the Company and the Requisite Backstop Lenders, such Eligible Offeree shall be deemed to have relinquished and waived its right to participate in the Funding Option.

(i)     [Reserved].

(j)     If, following the Subscription Option, the Company has received less than $50,000,000 of aggregate subscriptions, the Backstop Lenders will fund the Unsubscribed Term Loan, as set forth in Section 4.

2.     **Put Option.**

(a)     Sale of Put Option. The Company hereby agrees to purchase from each Backstop Lender, and each Backstop Lender hereby agrees to sell to the Company, an irrevocable put option (the "***Put Option***") requiring such Backstop Lender to fund, on the Plan Effective Date, its Backstop Lender Percentage of the Unsubscribed Term Loan, if any, as of the Expiration Time.

(b)     Put Option Exercise Period. Each Put Option is exercisable during the time between the Expiration Time and prior to the Plan Effective Date (the "***Put Option Exercise Period***").

(c)     Exercise of Put Option. Upon the exercise of a Put Option by the Company with respect to a Backstop Lender, this Agreement shall become a contract by such Backstop Lender to fund such Backstop Lender's Backstop Lender Percentage of the Unsubscribed Term Loan, if any, and such Backstop Lender shall fund, on the Plan Effective Date, subject to the terms and conditions as set forth herein, such Backstop Lender's Backstop Lender Percentage of the Unsubscribed Term Loan, if any.  The Company shall be deemed to have exercised each Put Option in full immediately prior to the end of the Put Option Exercise Period unless the Company shall have given written notice to such Backstop Lender on or prior to such time that it has elected not to exercise a Put Option.  Any such election by the Company not to exercise a Put Option shall not be effective and shall be void *ab initio* unless consented to in writing by the Requisite Backstop Lenders, which consent shall not be unreasonably withheld.

(d)     Put Option Termination. Each Backstop Lender's obligations with respect to its Put Option shall terminate automatically, without any further action by the Company or any Backstop Lender, if (i) the Company has given written notice, with the prior written consent of the Requisite Backstop Lenders, to the Backstop Lenders that it has elected not to exercise its Put Option pursuant to Section 2(c) hereof, (ii) upon valid termination of this Agreement by all Parties hereto pursuant to its terms, or (iii) this Agreement has been terminated by a Backstop Lender in accordance with its terms, in which case only the obligations of such Terminating Backstop Lender shall automatically terminate.

3.   **Funding Fee**

(a)     [Reserved].

(b)     On the Plan Effective Date, any Eligible Offeree who subscribes for and funds the Term Loan pursuant to the requirements of Section 1 shall receive its *pro rata* portion of a funding fee, payable in cash, of $3,000,000 (the "***Funding Fee***").

(c)     For purposes of this Section 3, "***pro rata***" shall equal a fraction the numerator of which is an Eligible Offeree's funded amount of the Term Loan and the denominator of which is $50,000,000.

4.   **The Backstop Lenders' Commitments**.

(a)     No less than three (3) Business Days before the Plan Effective Date, the Company shall deliver to counsel to the Backstop Lenders, by email and facsimile transmission, a certification by an authorized signatory of the Company providing either (i) a true and accurate calculation of the amount of the Unsubscribed Term Loan (a "***Purchase Notice***") along with each Backstop Lender's percentage of the Unsubscribed Term Loan required to be funded or (ii) in the absence of any Unsubscribed Term Loan, the fact that there is no Unsubscribed Term Loan and that the commitment of the Backstop Lenders hereunder to fund the Unsubscribe Term Loan are terminated (a "***Satisfaction Notice***").  The Company agrees to promptly provide any written backup, information and documentation relating to the information contained in the applicable Purchase Notice as any Backstop Lender may reasonably request.

(b)     On the basis of the representations and warranties contained herein, but subject to the conditions set forth in Section 11, each of the Backstop Lenders, severally and not jointly, agrees to fund, on the Plan Effective Date:

(i)      its Subscription Option; and

(ii)     the Unsubscribed Term Loan, if any, it is required to fund pursuant to a duly exercised Put Option pursuant to the terms hereof (together, the "***Backstop Commitments***").

(c)     On the Plan Effective Date, each Backstop Lender shall deliver to the Company (i) a duly executed signature page to the Credit Agreement, (ii) a duly completed and executed administrative agent questionnaire and (iii) a duly executed

4

accredited investor questionnaire certifying that the Eligible Offeree is an accredited investor.

(d)　On the Plan Effective Date, the Backstop Lenders will fund only such amount of the Unsubscribed Term Loan as is listed in the Purchase Notice, without prejudice to the rights of the Company or the Backstop Lenders to seek later an upward or downward adjustment if the amount of the Unsubscribed Term Loan in such Purchase Notice is inaccurate.

5.　**The Company's Commitments**

(a)　On the basis of the representations and warranties herein contained, but subject to the entry of the Confirmation Order, as consideration for the Backstop Lenders' Commitments and the other undertakings of the Backstop Lenders herein, including the Put Option, the Company will pay to the Backstop Lenders, in the aggregate, on the Plan Effective Date, a nonrefundable premium in the amount of $2,000,000 (the "***Backstop Put Premium***"), which shall be payable in cash to each Backstop Lender based on the Backstop Lender Percentages (as set forth on Exhibit A) whether or not the Put Option is exercised.

(b)　Subject to the entry of the Confirmation Order, which order shall approve this Section 5(b), upon consummation of the Plan, the Company will reimburse or pay, as the case may be, the out-of-pocket expenses reasonably incurred by the Backstop Lenders whether prior to or after the date hereof (collectively, "***Transaction Expenses***"), including all reasonable fees with respect to and in connection with the negotiation, documentation and execution of the transactions and agreements contemplated herein, and including, but not limited to all reasonable fees, expenses and costs relating to the Company's Chapter 11 Cases and including all reasonable fees and expenses of (i) Fried, Frank, Harris, Shriver & Jacobson LLP and McKool Smith PC, counsel to the Backstop Lenders and (ii) FTI Consulting, Inc., as advisor to the Backstop Lenders.

6.　**Backstop Lender Replacement Backstop**.

(a)　Replacement Option. If any Backstop Lender (i) defaults on any of its Backstop Commitment obligations under this Agreement (such default, an "***Backstop Lender Default***", and such Backstop Lender a "***Defaulting Backstop Lender***"), or (ii) validly terminates this Agreement, (such termination, an "***Backstop Lender Termination***" and such Backstop Lender, a "***Terminating Backstop Lender***"), the Company shall, within two (2) Business Days thereof, provide written notice (a "***Company Replacement Notice***") to each Non-Defaulting or Non-Terminating Backstop Lender (as applicable) of such Backstop Lender Default or Backstop Lender Termination (as applicable). Each Non-Defaulting or Non-Terminating Backstop Lender (as applicable) shall then have the option (the "***Replacement Option***"), but not the obligation, to, within five (5) Business Days of receipt of a Company Replacement Notice to provide written notice (a "***Backstop Lender Replacement Notice***") to the Company and the other Backstop Lenders that such Backstop Lender agrees to be subject to the Put Option for up to 100% of the Defaulting Backstop Lenders' or the Terminating Backstop Lenders' (as

applicable) Backstop Commitment (an "***Backstop Lender Replacement***", and such Backstop Lender, a "***Participating Backstop Lender***"), to be allocated to each Participating Backstop Lender based on its Backstop Lender Percentage in the event of oversubscription (adjusted, as applicable, for the removal of any Terminating Backstop Lender, any Defaulting Backstop Lender and any Backstop Lender not wishing to exercise its Replacement Option) on the terms and subject to the conditions set forth in this Agreement.

(b)     In the event the Participating Backstop Lenders, in the aggregate, elect to assume and exercise more than 100% of the Defaulting Backstop Lenders' or the Terminating Backstop Lenders' (as applicable) rights and obligations under this Agreement, the allocation of such rights and obligations to each Participating Backstop Lender shall be adjusted down proportionate to their respective Backstop Lender Percentages, so that the aggregate allocation to the Participating Backstop Lenders equals 100% of the Defaulting Backstop Lenders' or Terminating Backstop Lenders' (as applicable) obligations under this Agreement.  Within two (2) Business Days following of the deadline for submission of Backstop Lender Replacement Notices to the Company, and subject to receipt by the Company of such Backstop Lender's Replacement Notice, the Company shall provide written notice (a "***Final Replacement Notice***") to each Participating Backstop Lender, if any, informing it of the total amount of the Unsubscribed Term Loan (the "***Backstop Lender Replacement Funds***") that the Participating Backstop Lender is obligated to fund pursuant to the Backstop Lender Replacement.  Each Participating Backstop Lender must deliver the Backstop Lender Replacement Funds by wire transfer of immediately available funds to the account specified by the Company to the Participating Backstop Lenders (i) on the Plan Effective Date, if the Plan Effective Date has not occurred or (ii) within two (2) Business Days following receipt of the Final Replacement Notice if the Plan Effective Date has occurred.

(c)     For the avoidance of doubt, the assumption by any Participating Backstop Lender of any Defaulting Backstop Lender's obligations under this Agreement shall not relieve such Defaulting Backstop Lender of its liability for breach of this Agreement.

7.     **Representations and Warranties of the Company**.  The Company represents and warrants to, and agrees with, the Backstop Lenders as set forth below.  Except for representations, warranties and agreements that are expressly limited as to their date, each representation, warranty and agreement is made as of the date hereof.

(a)     <u>Organization and Qualification</u>.  The Company is duly organized, validly existing and in good standing under the laws of the State of Texas and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.  The Company is duly qualified or authorized to do business and is in good standing under the laws of each jurisdiction in which it owns or leases real property or in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing in each non-Texas jurisdiction would not be reasonably likely to result in a Material Adverse Effect (as defined in <u>Section 7(e)</u> hereof).

6

(b)     Power and Authority.

(i)     The Company has the requisite corporate power and authority to enter into, execute and deliver this Agreement and, subject to entry of the Confirmation Order and consummation of the Plan, to perform its obligations hereunder.  The Company has taken all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Agreement.

(ii)     The Company has the requisite corporate power and authority to execute the Plan and to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and consummation of the Plan, to perform its obligations thereunder, and will have taken all necessary corporate action required for the due authorization, execution, delivery and performance by it of the Plan.

(c)     Execution and Delivery; Enforceability.

(i)     The Plan will be duly and validly filed with the Bankruptcy Court by the Company in accordance with Section 9(a) and, upon entry of the Confirmation Order and consummation of the Plan, will constitute the valid and binding obligation of the Company, enforceable against it in accordance with its terms.

(d)     Authorized Capital.  Upon the Plan Effective Date, the authorized capital of the Company will conform to the authorized capital set forth in the Plan and Disclosure Statement.

(e)     No Conflict.  Subject to entry of the Confirmation Order and consummation of the Plan and the execution and delivery (or, with respect to the Plan, the filing with the Bankruptcy Court) by the Company of this Agreement and the Plan and compliance by it with all of the provisions hereof and thereof and the consummation of the transactions contemplated hereby and thereby: (i) will not conflict with or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent expressly provided in or contemplated by the Plan, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company is a party or by which the Company is bound or to which any of their properties or assets is subject; (ii) will not result in any violation of the provisions of the organizational documents of the Company; and (iii) assuming the accuracy of the Backstop Lenders' representations and warranties in Section 8, will not result in any violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of their properties, except in any such case described in clause (i) or clause (iii), as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  For purposes of this Agreement, "*Material Adverse Effect*" means a material adverse effect on (A) the business, assets, properties, results of operations or financial condition of the Company or (B) the ability of the Company, subject to the approvals and other authorizations set forth in Section 7(f), to consummate

7

the transactions contemplated by this Agreement or the Plan, other than, with respect to clauses (A) and (B), the effect: (1) resulting from the filing of the Chapter 11 Cases or the public announcement thereof, any reasonably anticipated effects thereof or from any action approved by the Bankruptcy Court; (2) resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the transactions contemplated hereby; or (3) resulting from any act or omission of the Company taken with the prior written consent of the Requisite Backstop Lenders.

(f)     Consents and Approvals.  Assuming the accuracy of the Backstop Lenders' representations and warranties in Section 8 and subject to confirmation of the Plan, no consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Company or any of their properties is required for the commencement or the consummation of the Funding Option by the Company and the execution and delivery by the Company of this Agreement or the Plan and performance of and compliance by the Company with all of the provisions hereof and thereof (including payment of the Backstop Put Premium and Transaction Expenses of the Backstop Lenders as required hereby) and the consummation of the transactions contemplated hereby and thereby, except (i) the entry of the Confirmation Order and (ii) such consents, approvals, authorizations, registrations or qualifications the absence of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(g)     Financial Statements.  The financial statements and the related notes thereto of the Company and its consolidated subsidiaries included or incorporated by reference in the documents filed by the Company with the SEC under the Securities Exchange Act of 1934 and the rules and regulations of the SEC thereunder (the "*Exchange Act*") as of December 31, 2015 and for the year then ended and as of each of March 31, 2016, June 30, 2016 and September 30, 2016, and for the quarterly and year to date periods then ended (the "*Exchange Act Documents*") present fairly in all material respects the consolidated financial position of the Company and its subsidiaries as of the dates indicated and the results of their operations and their cash flows for the periods specified provided that the quarterly statements have certain condensed presentations. Such financial statements have been prepared in conformity with generally accepted accounting principles applied on a consistent basis throughout the periods covered thereby (except as disclosed in the Exchange Act Documents).

(h)     Exchange Act Documents.  The Exchange Act Documents, when they became effective or were filed with the SEC, as the case may be, conformed in all material respects to the requirements of the Exchange Act, and none of such Exchange Act Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; and any further documents so filed and incorporated by reference when such documents are filed with the SEC, will conform in all material respects to the requirements of the Exchange Act, and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(i)     No Violation.  The Company is not, except as a result of the Chapter 11 Cases or as disclosed prior to the date of this Agreement in the Exchange Act Documents, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such default or violation that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(j)     Legal Proceedings.  Except as disclosed prior to the date of this Agreement in the Exchange Act Documents, there are no legal, governmental or regulatory investigations, actions, suits or proceedings pending or, to the knowledge of the Company, threatened, in each case, to which the Company is or may be a party or to which any property of the Company is or may be the subject that, individually or in the aggregate would reasonably be expected to result in a Material Adverse Effect.

(k)     No Broker's Fees.  The Company is not a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against it or the Backstop Lenders for a brokerage commission, finder's fee or like payment in connection with the offering of the Term Loan.

(l)     Absence of Certain Changes. Since September 30, 2016, no change, event, circumstance effect, development, occurrence or state of facts has occurred or exists that have had or are reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(m)    Environmental.  Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (i) no written notice, claim, demand, request for information, order, complaint or penalty has been received by the Company, and there are no judicial, administrative or other actions, suits or proceedings pending or, to the knowledge of the Company, threatened which allege a violation of or liability under any Environmental Laws, in each case relating to the Company, (ii) the Company is in compliance with Environmental Law and has obtained, maintains in full force and effect, and is in compliance with all permits, licenses and other approvals currently required under any Environmental Law for conduct of its business as presently conducted by the Company, and (iii) no Hazardous Materials have been released by the Company at any location in a manner that would reasonably be expected to give rise to any cost, liability or obligation of the Company under any Environmental Laws. For purposes of this Agreement, "***Environmental Law***" means all applicable foreign, federal, state and local conventions, treaties, protocols, laws, statutes, rules, regulations, ordinances, orders and decrees relating in any manner to contamination, pollution or protection of the environment or exposure to hazardous or toxic substances, materials or wastes, and "***Hazardous Materials***" means all materials, substances, chemicals, or wastes (or combination thereof) that is listed, defined, designated, regulated or classified as hazardous, toxic, radioactive, dangerous, a pollutant, a contaminant, petroleum, oil, or words of similar meaning or effect under any Environmental Law.

9

(n)      Insurance.  The Company has insured its respective properties and assets against such risks and in such amounts as are customary for companies engaged in similar businesses. All premiums due and payable in respect of material insurance policies maintained by the Company have been paid. As of the date hereof, to the knowledge of the Company, the Company has not received notice from any insurer or agent of such insurer with respect to any material insurance policies of the Company of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired in accordance with their terms.

(o)      Intellectual Property.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) the Company owns, or possesses the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights, licenses, domain names, and any and all applications or registrations for any of the foregoing (collectively, "**_Intellectual Property Rights_**") that are reasonably necessary for the operation of its business, without conflict with the rights of any other person, (ii) to the knowledge of the Company, neither the Company nor any Intellectual Property Right, proprietary right, product, process, method, substance, part, or other material now employed, sold or offered by the Company, is infringing upon, misappropriating or otherwise violating any valid Intellectual Property Rights of any person, and (iii) no claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Company, threatened.

(p)      No Undisclosed Relationship.  No relationship, direct or indirect, exists between or among the Company, on the one hand, and the directors, officers and 5% stockholders of the Company, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC and that are not so described in such filings, except for the transactions contemplated by this Agreement.

(q)      Money Laundering Laws.  The operations of the Company are and have been at all times, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the money laundering statutes of all jurisdictions in which the Company operates (and the rules and regulations promulgated thereunder) and any related or similar laws and no material legal proceeding by or before any governmental entity or any arbitrator involving the Company with respect to such laws is pending or, to the knowledge of the Company, threatened.

(r)      Sanctions Laws.  Neither the Company nor, to the knowledge of the Company, any of its respective directors, officers, employees or other persons acting on its behalf with express authority to so act are currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department. The Company will not directly or indirectly use the proceeds of the Funding Option, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person, for the purpose of financing the activities of any person that, to the knowledge of the Company, is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department.

10

(s)     Foreign Corrupt Practices Act.  The Company has no knowledge of any actual or alleged material violations of the Foreign Corrupt Practices Act of 1977, as amended, or any applicable anti-corruption or anti-bribery laws in any jurisdiction other than the United States, by the Company or any of its respective officers, directors, agents, distributors, employees or any other person acting on behalf of the Company.

(t)     Taxes.

(i)     The Company and each of its subsidiaries have paid, or will pay in full pursuant to the Plan, all material income, gross receipts, license, payroll, employment, excise, severance, occupation, premium, windfalls profits, customs duties, capital stock, franchise, profits, withholding, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated or other taxes levied by a governmental authority, including interest and penalties thereon ("***Taxes***") imposed on it or its assets, business or properties, or, to the extent not yet due, such Taxes have been accrued and fully provided for in accordance with generally accepted accounting principles. The Company and each of its subsidiaries has timely filed all returns, information statements or reports required to be filed with any governmental authority with respect to Taxes.

(ii)     There are no material Liens for Taxes on any asset of the Company or its subsidiaries other than liens for Taxes not yet delinquent or for Taxes contested in good faith by appropriate proceedings.

(iii)     The Company and its subsidiaries have no liability for any material amount of Taxes of any other person or entity, either by operation of law, by contract or as a transferee or successor. The Company and its subsidiaries are not a party to any material Tax allocation or Tax sharing agreement with any third party (other than an agreement entered into in the ordinary course of business consistent with past practice (such as a lease or a license) the principal purpose of which is not the sharing, assumption or indemnification of Tax).

(iv)     As of the date hereof, there is no outstanding audit, assessment, dispute or claim concerning any material Tax liability of the Company and its subsidiaries (taken as a whole), and the Company and its subsidiaries have not received from any governmental authority any written notice regarding any contemplated or pending audit, examination or other administrative proceeding or court proceeding concerning any material amount of Taxes imposed thereon.

(v)     All material Taxes that the Company and its subsidiaries (taken as a whole) were (or was) required by law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid to the proper authorities to the extent due and payable.

(vi)     None of the Company and any of its subsidiaries has been included in any "consolidated," "unitary" or "combined" Tax Return provided for under

any law with respect to Taxes for any taxable period for which the statute of limitations has not expired (other than a group of which the Company and/or its current or past Subsidiaries are or were the only members).

(vii)    None of the Company and any of its subsidiaries has been either a "distributing corporation" or a "controlled corporation" in a distribution occurring during the last five years in which the parties to such distribution treated the distribution as one to which Section 355 of the Internal Revenue Code of 1986, as amended (the "**Code**"), is applicable.

(viii)    None of the Company and any of its subsidiaries has been requested in writing, and, to the knowledge of the Company, there are no claims against the Company or any of its subsidiaries, to pay any liability for Taxes of any person (other than the Company or its subsidiaries) that are material to the Company and its subsidiaries taken as a whole, arising from the application of Treasury Regulation Section 1.1502-6 or any analogous provision of state, local or foreign law, or as a transferee or successor.

(ix)    The Company has not been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code at any time during the five (5) year period ending on the date hereof.

(u)    Title to Property.

(i)    Personal Property.  Except as set forth on Schedule 7(u)(i), would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (A) the Company has good title to, free and clear of any and all Liens, or a valid leasehold interest in, all personal properties, machinery, equipment and other tangible assets of the business necessary for the conduct of the business as presently conducted by the Company and (B) such properties, (x) are in the possession or control of the Company; and (y) are in good and operable condition and repair, reasonable wear and tear excepted.

(ii)    Leased Real Property.  The Company has complied with all obligations under all leases to which it is a party, except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and all such leases are in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Company enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(v)    Disclosure.  The Company has disclosed to the Backstop Lenders all agreements, instruments and corporate or other restrictions to which it or any of its subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  No report,

financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of the Company (other than projected financial information, pro forma financial information and information of a general economic or industry nature) to any Backstop Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder contains any material misstatement of fact or omits to state any material fact necessary in light of the circumstances under which they were made, in order to make the statements therein when taken together with all of the disclosures, not materially misleading; provided that, with respect to projected and pro forma financial information, the Company represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of delivery of such information to any Backstop Lender; it being understood that such projections may vary from actual results and that such variances may be material.

(w)     [Reserved].

8.     **Representations and Warranties of the Backstop Lenders**.  Each of the Backstop Lenders severally represents and warrants to, and agrees with, the Company as set forth below. Each representation, warranty and agreement is made as of the date hereof.

(a)     Formation.  Such Backstop Lender has been duly organized or formed, as applicable, and is validly existing as a corporation or other entity in good standing under the applicable laws of its jurisdiction of organization or formation.

(b)     Power and Authority.  Such Backstop Lender has the requisite power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement.

(c)     Execution and Delivery.  This Agreement has been duly and validly executed and delivered by such Backstop Lender and constitutes its valid and binding obligation, enforceable against such Backstop Lender in accordance with its terms.

(d)     Access to Information.  Such Backstop Lender acknowledges that it has been afforded the opportunity to ask questions and receive answers concerning the Company and to obtain additional information that it has requested to verify the accuracy of the information contained herein.

9.     **Additional Covenants of the Company**.  The Company agrees with the Backstop Lenders as follows:

(a)     Plan and Disclosure Statement.  The Company shall: (i) file on the Petition Date or within one (1) Business Day thereafter, the Plan and a related disclosure statement (the "***Disclosure Statement***") with the Bankruptcy Court, each in form and substance acceptable to the Requisite Backstop Lenders, and that is consistent in all material respects with the Plan or as otherwise approved by the Requisite Backstop Lenders, it being understood that the form of Plan and the form of the Disclosure Statement attached as Exhibit A and Exhibit D, respectively, to the Restructuring Support Agreement are acceptable to the Requisite Backstop Lenders, and (ii) seek the entry of a

13

Confirmation Order by the Bankruptcy Court, in form and substance acceptable to the Requisite Backstop Lenders, as soon as practicable, which order shall include approval of the Disclosure Statement and this Agreement.  The Company will provide counsel to the Backstop Lenders with a draft copy of the Confirmation Order and a reasonable opportunity to review and comment on such order prior to such order being filed with the Bankruptcy Court.

(b)     <u>Funding Option</u>.  The Company shall effectuate the Funding Option in accordance with the Plan and the terms of this Agreement.

(c)     <u>Unsubscribed Term Loan</u>.  The Company, in consultation with counsel for the Backstop Lenders, shall determine the amount of the Unsubscribed Term Loan, if any, and, in good faith, provide a Purchase Notice or a Satisfaction Notice that accurately reflects the amount of the Unsubscribed Term Loan as so determined and to provide to the Backstop Lenders a certification by the Company of the Unsubscribed Term Loan or, if such certification is not available, such written backup to the determination of the Unsubscribed Term Loan as the Backstop Lenders may reasonably request.

(d)     <u>Approvals</u>.  Except as set forth in this Agreement or with the prior written consent of the Requisite Backstop Lenders, during the period from the date of this Agreement to the earlier of the Plan Effective Date and the date on which this Agreement is terminated in accordance with its terms, the Company shall use reasonable best efforts to reasonably promptly take all actions and prepare and file all necessary documentation (including by reasonably cooperating with the Backstop Lenders as to the appropriate time of filing such documentation and its content) and to effect all applications that are necessary or advisable in connection with seeking any governmental approval, exemption or authorization from any governmental authority, including under any Antitrust Laws that are necessary to consummate and make effective the transactions contemplated by this Agreement.  The Company shall reasonably promptly notify the Backstop Lenders (and furnish to them copies of, if requested) any communications from governmental authorities and shall not participate in any meeting with any such authority unless it consults with the Backstop Lenders in advance to the extent permitted by applicable law and gives the Backstop Lenders a reasonable opportunity to attend and participate thereat to the extent permitted by applicable law.  The Company shall not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties hereto to obtain any necessary approvals required for the transactions contemplated by this Agreement.  For purposes of this Agreement, "***Antitrust Laws***" means the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder (the "***HSR Act***") and any similar law enforced by any governmental antitrust entity of any jurisdiction regarding pre-acquisition notifications for the purpose of competition reviews of mergers and acquisitions, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and all other applicable laws that are designed or intended to prohibit, restrict or regulate actions or transactions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition or effectuating foreign investment.

14

(e)    <u>Conduct of Business</u>.  During the period from the date of this Agreement to the earlier of the Plan Effective Date and the date on which this Agreement is terminated in accordance with its terms, the Company shall carry on its business in the ordinary course and use its commercially reasonable efforts to (i) preserve intact its business, (ii) keep available the services of its officers and employees and (iii) preserve its material relationships with customers, suppliers, licensors, licensees, distributors and others having material business dealings with the Company in connection with its business. During the period from the date of this Agreement to the earlier of the Plan Effective Date and the date on which this Agreement is terminated in accordance with its terms, the Company shall not enter into any transaction that is material to its business other than transactions in the ordinary course of business, except with the consent of the Required Backstop Lenders.

(f)    <u>Access to Information</u>.   The Company shall (i) afford the Backstop Lenders and their respective representatives upon request and reasonable notice, from the period commencing on the date hereof and through the Plan Effective Date, reasonable access, during normal business hours and without unreasonable disruption or interference with the Company's business or operations, to the Company's management employees and (ii) during such period, furnish promptly to such parties all reasonable information concerning the Company's business, properties and personnel as may reasonably be requested by any such party, provided that the foregoing shall not require the Company (A) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company to violate any of its obligations with respect to confidentiality to a third party if the shall have used its reasonable best efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (B) to disclose any legally privileged information of the Company or (C) to violate any applicable laws or orders.

(g)    <u>Further Assurances</u>.  Without in any way limiting any other obligation of the Company in this Agreement, the Company shall use commercially reasonable efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, and as any Backstop Lender may reasonably request, in order to consummate and make effective the transactions contemplated by this Agreement.  The Company furthermore agrees that it shall perform any and all of its covenants, agreements and obligations under this Agreement and not take any actions that would be inconsistent with such obligations.

(h)    <u>Tax Treatment of Put Option</u>. The Company agrees to treat, for U.S. federal income tax purposes, its Put Option as an option to cause the Backstop Lenders to purchase the Unsubscribed Term Loan and to treat the Backstop Put Premium as an adjustment to the Unsubscribed Term Loan acquired by the Backstop Lenders pursuant to the transactions contemplated by this Agreement.

10.    **Additional Covenant of the Backstop Lenders: Approvals**.  Each of the Backstop Lenders agrees, severally and not jointly, with the Company, that except as set forth in this Agreement or with the prior written consent of the Company, during the period from the date of this Agreement to the earlier of the Plan Effective Date and the date on which this Agreement is

15

terminated in accordance with its terms, the Requisite Backstop Lenders shall use reasonable best efforts to promptly take all actions and prepare and file all necessary documentation (including by reasonably cooperating with the Company as to the appropriate time of filing such documentation and its content) and to effect all applications that are necessary or advisable in connection with seeking any governmental approval, exemption or authorization from any governmental authority, including under any Antitrust Laws that are necessary to consummate and make effective the transactions contemplated by this Agreement.

11.   **Conditions to the Obligations of the Backstop Lenders**.  The obligations of the Backstop Lenders to fund the Unsubscribed Term Loan pursuant to their respective Backstop Lenders' Commitments on the Plan Effective Date are subject to the satisfaction of the following conditions (unless waived by the Requisite Backstop Lenders):

(a)   Plan and Confirmation Order.  The Plan, as approved, and the Confirmation Order, as entered by the Bankruptcy Court and which shall be binding and effective, shall each be in the form and substance approved by the Requisite Backstop Lenders, with only such amendments, modifications or changes that are satisfactory to the Requisite Backstop Lenders.

(b)   Conditions to Plan Effective Date.  The conditions to the Plan Effective Date set forth in the Plan shall have been satisfied (or waived by the Requisite Backstop Lenders) in accordance with the Plan and the Plan Effective Date shall have occurred.

(c)   Funding Option.  The Funding Option shall have been conducted in all material respects in accordance with this Agreement and the Expiration Time shall have occurred.

(d)   Purchase Notice or Satisfaction Notice.  The Backstop Lenders shall have received a Purchase Notice or Satisfaction Notice from the Company, as applicable, in accordance with Section 4(a).

(e)   No Restraint.  No judgment, injunction, decree or other legal restraint shall prohibit the consummation of the Plan, the Funding Option or the transactions contemplated hereby.

(f)   Representations and Warranties.  The representations and warranties of the Company set forth in this Agreement shall be true and correct at and as of the Plan Effective Date as if made on and as of the Plan Effective Date (or, to the extent given as of a specific date, as of such date), except for such failures to be true and correct that, individually and in the aggregate, would not be reasonably likely to result in a Material Adverse Effect.

(g)   Covenants.  The Company shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Plan Effective Date.

(h)     Payments.  All fees and other amounts, including the Backstop Put Premium, required to be paid or reimbursed by the Company to the Backstop Lenders as of the Plan Effective Date shall have been so paid or reimbursed.

(i)     Material Adverse Effect.  Since September 30, 2016, there shall not have occurred, and there shall not exist, any change, event, circumstance, effect, development, occurrence or state of facts that constitutes, individually or in the aggregate, a Material Adverse Effect.

(j)     Officer's Certificate.  The Backstop Lenders shall have received on and as of the Plan Effective Date a certificate of the chief executive officer or chief financial officer of the Company, in their capacity as such and not in their individual capacity, confirming that the conditions set forth in Section 11(f) and Section 11(g) have been satisfied.

(k)     Tax Treatment of Put Option.  Each Backstop Lender agrees to treat, for U.S. federal income tax purposes, its Put Option as an option requiring each Backstop Lender, at the Company's option, to purchase its Backstop Lender Percentage of the Unsubscribed Term Loan, and to treat the Backstop Put Premium as an adjustment to each Backstop Lender Percentage of the Unsubscribed Term Loan acquired pursuant to the transactions contemplated by this Agreement.

12.    **Conditions to the Obligations of the Company**.  The obligations of the Company pursuant to this Agreement on the Plan Effective Date are subject to satisfaction of the following conditions (unless waived by the Company), except where the failure to satisfy any such condition is the result of a failure by the Company to comply with this Agreement:

(a)     Confirmation Order.  The Confirmation Order, in form and substance acceptable to each of the Company and the Requisite Backstop Lenders, shall have been entered by the Bankruptcy Court, and such order shall be a Final Order (as defined in the Plan).

(b)     Conditions to Confirmation.  The conditions to confirmation and the conditions to the Plan Effective Date set forth in the Plan shall have been satisfied (or waived by the Company) in accordance with the Plan and the Plan Effective Date shall have occurred.

(c)     No Restraint.  No judgment, injunction, decree or other legal restraint shall prohibit the consummation of the Plan, the Funding Option or the transactions contemplated hereby.

(d)     Representations and Warranties.  The representations and warranties of the Backstop Lenders set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, in each case, on and as of the Plan Effective Date as if made on and as of the Plan Effective Date (or, to the extent given as of a specific date, as of such date).

17

      (e)    <u>Covenants</u>.  The Backstop Lenders shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Backstop Lenders on or prior to the Plan Effective Date.

13.    **<u>Survival of Representations and Warranties</u>**.  The representations and warranties made in this Agreement will not survive the Plan Effective Date.  Covenants and agreements that by their terms are to be satisfied after the Plan Effective Date shall survive until satisfied in accordance with their terms.

14.    **<u>Termination</u>**.

      (a)    <u>Mutual Termination</u>. The Company and the Requisite Backstop Lenders may terminate this Agreement by mutual written consent.

      (b)    <u>Backstop Lender Termination</u>. At 11:59 p.m. prevailing Eastern Time on the date that is 365 days after the effective date of the Restructuring Support Agreement, each Backstop Lender may terminate this Agreement, solely as to such terminating Backstop Lender, by written notice to the Company.

      (c)    <u>Termination by the Requisite Backstop Lenders</u>.  The Requisite Backstop Lenders may terminate this Agreement by written notice to the Company upon the occurrence and during the continuance of any of the following:

          (i)    upon the breach in any material respect by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth herein which remains uncured for a period of ten (10) Business Days after the receipt of written notice of such breach from any of the Requisite Backstop Lenders pursuant to this <u>Section 14</u> and in accordance with <u>Section 13</u> (as applicable);

          (ii)    [Reserved];

          (iii)    at 11:59 p.m. prevailing Eastern Time on March 9, 2017 (the "***Confirmation Date***"), if the Bankruptcy Court shall not have entered an order in form and substance satisfactory to the Company and the Requisite Backstop Lenders confirming the Plan and approving the Disclosure Statement and this Agreement;

          (iv)    at 11:59 p.m. prevailing Eastern Time on March 24, 2017 (the "***Outside Date***"), if the Plan Effective Date shall not have occurred;

          (v)    at 11:59 p.m. prevailing Eastern Time on the date that is ten (10) Business Days after issuance of Company Replacement Notice, if the other Backstop Lenders or Eligible Offerees have failed to assume 100% of the rights and obligations of the Defaulting Backstop Lenders or the Terminating Backstop Lenders, as applicable, pursuant to <u>Section 6</u> or otherwise, <u>unless</u> the Company provides evidence satisfactory to the Non Defaulting Backstop Lenders (in their sole discretion) that such non-assumed Backstop Lender Defaults or Backstop Lender Terminations, as applicable, would not otherwise prevent consummation of the Plan;

18

(vi)   if an examiner with expanded powers or a trustee shall have been appointed in the Chapter 11 Cases or if the Chapter 11 Cases shall have been converted to cases under chapter 7 of the Bankruptcy Code or have been dismissed by order of the Bankruptcy Court;

(vii)   if the Debtors file, propound or otherwise support any plan of reorganization other than the Plan;

(viii)   on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan or refusing to approve the Disclosure Statement, provided that the Requisite Backstop Lenders shall not have the right to terminate this Agreement pursuant to this Section 14(c)(viii) if the Bankruptcy Court declines to approve the Disclosure Statement or denies confirmation of the Plan subject only to modifications to the Plan or Disclosure Statement which (A) are not inconsistent with the Plan (as same may be modified, amended or supplemented in accordance with the terms of this Agreement), (B) do not create any new material obligation on any Party, and (C) do not adversely affect the agreed treatment or rights of such Party (it being agreed that, for the avoidance of doubt, any change to the Plan that results in a diminution of the value of the property to be received by a Requisite Backstop Lender under the Plan shall be deemed to adversely affect such Backstop Lenders);

(ix)   upon the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring, which ruling, judgment or order has not been not stayed, reversed or vacated within five (5) Business Days after such issuance;

(x)   upon the failure of any of the conditions set forth in Section 11 to be satisfied when required to be satisfied; or

(xi)   upon the termination of the Restructuring Support Agreement.

(d)   Termination by the Company.  The Company may terminate this Agreement by written notice to the Backstop Lenders upon the occurrence of any of the following:

(i)   upon the breach in any material respect by one or more of the Backstop Lenders of any of the undertakings, representations, warranties or covenants of the Backstop Lenders set forth herein which remains uncured for a period of ten (10) Business Days after the receipt of written notice of such breach from the Company pursuant to this Section 14 and in accordance with Section 15 (as applicable);

(ii)   upon the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring, which ruling, judgment or order has not been not stayed, reversed or vacated within ten (10) Business Days after such issuance;

(iii)    at 11:59 p.m. prevailing Eastern Time on the Confirmation Date, if the Bankruptcy Court shall not have entered an order in form and substance satisfactory to the Company and the Requisite Backstop Lenders confirming the Plan and approving the Disclosure Statement;

(iv)    at 11:59 p.m. prevailing Eastern Time on the Outside Date, if the Plan Effective Date shall not have occurred;

(v)    upon the failure of any of the conditions set forth in Section 11 to be satisfied when required to be satisfied;

(vi)    upon the termination of the Restructuring Support Agreement; or

(vii)    on the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan or refusing to approve the Disclosure Statement, provided that the Requisite Backstop Lenders shall not have the right to terminate this Agreement pursuant to this Section 14(d)(vii) if the Bankruptcy Court declines to approve the Disclosure Statement or denies confirmation of the Plan subject only to modifications to the Plan or Disclosure Statement which (A) are not inconsistent with the Plan (as same may be modified, amended or supplemented in accordance with the terms of this Agreement), (B) do not create any new material obligation on any Party, and (C) do not adversely affect the agreed treatment or rights of such Party (it being agreed that, for the avoidance of doubt, any change to the Plan that results in a diminution of the value of the property to be received by a Requisite Backstop Lender under the Plan shall be deemed to adversely affect such Backstop Lenders).

(e)    Effect of Termination.  Subject to Section 17, upon termination of this Agreement, each party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the transactions contemplated hereby or otherwise, that it would have been entitled to take had it not entered into this Agreement.  Notwithstanding anything contained herein, if this Agreement is terminated as a result of a breach of this Agreement by a party hereto, such party shall not be released and shall remain liable for any damages resulting from such termination.

(f)    Termination Fee.  To the extent this Agreement is terminated pursuant to Section 14(d)(vi) as a result of termination of the Restructuring Support Agreement pursuant to Section 18 thereof, the Company shall immediately pay, in cash, to the Backstop Lenders (pro rata in accordance with their Backstop Lender Percentages) a non-refundable fee in an aggregate amount equal to $2,500,000 (the "***Termination Fee***").

15.    **Indemnification Obligations**.

(a)    Following the entry of the Confirmation Order, the Company shall indemnify and hold harmless each Backstop Lender and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective representatives and controlling persons (each acting in such capacity, an "***Indemnified Person***") from

20

and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Backstop Lenders except to the extent otherwise provided for in this Agreement) (collectively, "*Losses*") that any such Indemnified Person may incur or to which any such Indemnified Person may become subject arising out of or in connection with this Agreement, the Plan and the transactions contemplated hereby and thereby, including the Backstop Lenders' Commitments, the Funding Option, the payment of the Backstop Put Premium or the Transaction Expenses, or the use of the proceeds of the Funding Option, or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, its equity holders, Affiliates, creditors or any other person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal or other third party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Plan are consummated or whether or not this Agreement is terminated; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (i) as to any Backstop Lender that has defaulted on its obligation to exercise its Subscription Option or to fund such Backstop Lender's Backstop Commitment of any of the Unsubscribed Term Loan or any Indemnified Person related thereto, caused by such default by such Backstop Lender, or (ii) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person.

(b) <u>Indemnification Procedure</u>. Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "*Indemnified Claim*"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; <u>provided</u>, that (i) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (ii) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this <u>Section 15</u>. In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof; <u>provided</u>, that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select one separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims.

Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof or participation therein (other than reasonable costs of investigation) unless (A) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims, (B) the Indemnifying Party shall not have employed counsel to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (C) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination, and such failure is not reasonably cured within five (5) Business Days of receipt of such notice, or (D) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person. Notwithstanding anything herein to the contrary, the Company shall have sole control over any Tax controversy or Tax audit and shall be permitted to settle any liability for Taxes of the Company.

(c)     Settlement of Indemnified Claims. The Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed). If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this Section 15.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole reasonable discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)     Contribution. If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to indemnification pursuant to Section 15(a), then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits

22

received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations. It is hereby agreed that the relative benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (i) the total value received by the Company pursuant to the Unsubscribed Term Loan in the Funding Option contemplated by this Agreement and the Plan, bears to (ii) the Backstop Put Premium paid or proposed to be paid to the Backstop Lenders. The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other person in connection with an Indemnified Claim.

(e)     <u>Treatment of Indemnification Payments.</u> All amounts funded by an Indemnifying Party to an Indemnified Person under this <u>Section 15</u> shall, to the extent permitted by applicable law, be treated as adjustments to the amount to be funded for the Unsubscribed Term Loan funder by such Indemnified Person for all Tax purposes. The provisions of this <u>Section 15</u> are an integral part of the transactions contemplated by this Agreement and without these provisions the Backstop Lenders would not have entered into this Agreement, and upon entry of the Confirmation Order, the obligations of the Company under this <u>Section 15</u> shall constitute allowed administrative expenses of the Debtors' estate under Sections 503(b) and 507 of the Bankruptcy Code and are payable without further order of the Bankruptcy Court, and the Company may comply with the requirements of this <u>Section 15</u> without further order of the Bankruptcy Court.

16.     **Notices**.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt), (b) when sent by facsimile (with written confirmation of transmission), (c) three (3) days after being deposited with the United States Post Office, by registered or certified mail, postage prepaid, (d) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), or (e) when sent by electronic mail (with acknowledgment received), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a party hereto may have specified by like notice):

If to Backstop Lenders, to each of the undersigned Backstop Lenders at the addresses listed on the signatures pages hereto,

        with a copy to:

        Fried, Frank, Harris, Shriver & Jacobson LLP
        One New York Plaza
        New York, New York 10004
        Attention:    Brad Eric Scheler, Matthew Roose and Josh Wechsler
        Facsimile:    (212) 299-6650
        Email:       Brad.Eric.Scheler@friedfrank.com
                    Matthew.Roose@friedfrank.com
                    Joshua.Wechsler@friedfrank.com

If to the Company, to:

        Forbes Energy Services Ltd.
        3000 South Business Highway 28
        Alice, TX 78333
        Telephone: (361) 664-0549
        Facsimile:  (361) 664-0599
        Attention:   L. Melvin Cooper

        with a copy to:

        Pachulski Stang Ziehl & Jones LLP
        10100 Santa Monica Boulevard, 13th Floor
        Los Angeles, California 90067-4100
        Telephone: (310) 277-6910
        Facsimile:  (310) 201-0760
        Attention:   Richard M. Pachulski, Esq.
                   Ira D. Kharasch, Esq.

17.    **Survival**.  Notwithstanding the termination of this Agreement, the agreements and obligations of the parties hereto in <u>Section 14(e)</u>, <u>Section 14(f)</u> and <u>Sections 15</u> through <u>24</u> shall survive such termination and shall continue in full force and effect for the benefit of the parties hereto in accordance with the terms hereof.

18.    **Assignment; Third Party Beneficiaries**.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned by any of the parties hereto without the prior written consent of the other parties hereto.  Notwithstanding the previous sentence, the Backstop Lenders' obligations hereunder may be assigned, delegated or transferred, in whole or in part, by any Backstop Lender to any Affiliate (as defined in Rule 12b-2 under the Exchange Act) of such Backstop Lender over which such Backstop Lender or any of its Affiliates exercises investment authority, including with respect to voting and dispositive rights; <u>provided</u> that any such assignee assumes the obligations of the assigning Backstop Lender hereunder and agrees in writing prior to such assignment to be bound by the terms of this

24

Agreement in the same manner as the assigning Backstop Lender.  Notwithstanding the foregoing or any other provisions herein, no such assignment will relieve the assigning Backstop Lender of its obligations hereunder if such assignee fails to perform such obligations.  This Agreement (including the documents and instruments referred to herein) is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Agreement.

19.    **Complete Agreement**.  This Agreement (including the Exhibits and the other documents and instruments referred to herein constitutes the entire agreement of the parties hereto and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the parties hereto with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements heretofore executed among the parties hereto will continue in full force and effect.

20.    **Governing Law; Submission to Jurisdiction; Selection of Forum; Waiver of Trial by Jury**.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the signatories hereto irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the United States District Court for the Southern District of New York, and by execution and delivery of this Agreement, each of the signatories hereto irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.  Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced by the Company, each of the signatories hereto agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.  Each party hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  EACH PARTY HERETO WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING BASED UPON, ARISING OUT OF, OR RELATED TO THIS AGREEMENT, ANY PROVISION HEREOF OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

21.    **Counterparts**.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties hereto and delivered to the other parties hereto (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

22.    **Action by, or Consent or Approval of, the Backstop Lenders**.  Whenever this Agreement refers to any action to be taken by, or any consent or approval to be given by, the Backstop Lenders, unless otherwise expressly provided in any particular instance, such reference shall be deemed to require the action, consent or approval of the Requisite Backstop Lenders.

23.   **Amendments and Waivers**.

(a)   This Agreement may be amended, modified or supplemented and the terms and conditions of this Agreement may be waived, only by a written instrument signed by the Company and the Requisite Backstop Lenders and subject, to the extent required after the Petition Date, to the approval of the Bankruptcy Court; provided that any modification of, or amendment or supplement to, this Agreement that would (i) have the effect of materially and adversely affecting any Backstop Lender in a manner that is disproportionate to any other Backstop Lender or the Backstop Lenders as a whole, or increasing or decreasing an Backstop Lender's Backstop Lender Percentage (as set forth on Exhibit A) shall require the prior written consent of such Backstop Lender, or (ii) be inconsistent with the Plan or would have the effect of modifying this sentence shall require the prior written consent of all of the Backstop Lenders; provided, further, that any modification of, or amendment or supplement to Section 14(b) hereof shall require the prior written consent of each such Backstop Lender affected thereby.

(b)   No delay on the part of any party hereto in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party hereto of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party hereto otherwise may have at law or in equity.

24.   **Specific Performance**.  The parties hereto acknowledge and agree that any breach of the terms of this Agreement would give rise to irreparable harm for which money damages would not be an adequate remedy and, accordingly, the parties hereto agree that in addition to any other remedies, each party hereto will be entitled to enforce the terms of this Agreement by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without the necessity of posting bond.

25.   **Other Interpretive Matters**.

(a)   Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply: (i) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day; (ii) any reference in this Agreement to $ shall mean U.S. dollars; (iii) all exhibits and schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein and any capitalized terms used in any exhibit or schedule but not otherwise defined therein shall be defined as set forth in this Agreement; (iv) words imparting the singular number only shall include the plural and vice versa; (v) the words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context

26

otherwise requires; (vi) the word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (vii) the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement; and (viii) all references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(b)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

**FORBES ENERGY SERVICES LTD.**

By: _L. M. Cooper_

Name: _L. Melvin Cooper_

Title: _SVP & CFO_

BACKSTOP PARTY

**ASCRIBE CAPITAL, LLC**
**(on behalf of itself and certain funds)**

By: _____
Name:   Lawrence First
Title:     Chief Investment Officer

Address: 299  Park Avenue, 34th Floor
New York, NY 10171
Attention: Mr. Lawrence A. First
Mr. Ross Solomon
Facsimile: (212) 697-5524]
email: lfirst@ascribecapital.com
rsolomon@ascribecapital.com

[Signature Page to Backstop Agreement (Forbes Energy Services)]

BACKSTOP PARTY

**COURAGE CAPITAL MANAGEMENT, LLC**
**(on behalf of itself and certain funds)**

By:

Name _____ Thomas G. Milne

Title: _____ President

| | |
|---|---|
| Address: | 4400 Harding Road |
| | Suite 503 |
| | Nashville, TN 37205 |
| | Attention: Michael Hamilton |
| Facsimile: | 615-296-4288 |
| email: | mhamilton@couragecap.com |
| | jwengraf@couragecap.com |

[Signature Page to Backstop Agreement (Forbes Energy Services)]

BACKSTOP PARTY



**PACIFIC INVESTMENT MANAGEMENT COMPANY LLC, as investment manager for various funds and accounts**

By:_____

Name:  Alfred Murata
Title:    Managing Director

Address: 1633 Broadway
New York NY 10019
Attention: Mr. Chris Neumeyer
Facsimile:  (212) 776-1520
email: chris.neumeyer@pimco.com

[Signature Page to Backstop Agreement (Forbes Energy Services)]

BACKSTOP PARTY

**PHOENIX INVESTMENT ADVISER LLC**
**(on behalf of itself and certain funds)**

By: _____
Name: Jeffrey Peskind
Title: CEO

Address: The Graybar Building
420 Lexington Avenue, Suite 2040
New York, NY 10170
Attention: Mr. Jeffrey Peskind
Mr. Alex Duncan
Facsimile:  [•]
email: jlpeskind@phoenixinvadv.com
aduncan@phoenixinvadv.com

[Signature Page to Backstop Agreement (Forbes Energy Services)]

BACKSTOP PARTY

**SOLACE FORBES HOLDINGS, LLC**
**By: Solace Capital Partners, L.P., its Manager**

By: _____
Name: NASEM ARASTU
Title: SR VICE PRESIDENT

Address: 11111 Santa Monica Boulevard, Suite 1275
Los Angeles, CA 90025
Attention: Mr. Brett Wyard
Mr. Naeem Arastu
Facsimile: (310) 919-5402
email: bwyard@solacecap.com
narastu@solacecap.com

[Signature Page to Backstop Agreement (Forbes Energy Services)]

**Exhibit A**

| Backstop Lender | Backstop Percentage | Backstop Commitment |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
| **Total:** | **100%** |  |

## **Exhibit B**

**Subscription Form**

**NOTICE AND INSTRUCTION FORM**

**to the holders (the "Senior Unsecured Noteholders") of the
9% Senior Notes Due 2019 (CUSIP No. 345143 AC 5)
(the "Senior Unsecured Notes")
issued under that certain Indenture, dated as of June 7, 2011
(as amended, the "Senior Unsecured Notes Indenture")**

**of**

**FORBES ENERGY SERVICES LTD., as Issuer**

**with respect to the Funding Option and the opportunity to act as lender
under the Loan and Security Agreement (as amended, the "Credit Agreement")
for a $50,000,000 Exit Facility Term Loan**

### IMPORTANT NOTICE
### REGARDING THE OPPORTUNITY TO PARTICIPATE
### AS A LENDER IN THE TERM LOAN

### ELIGIBILITY

YOU ARE ONLY ELIGIBLE TO PARTICIPATE IN THIS OPPORTUNITY IF YOU MEET THE FOLLOWING CRITERIA:

1. YOU ARE AN "ACCREDITED INVESTOR" AS SUCH TERM IS DEFINED IN RULE 501 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WHICH IS SET FORTH ON ANNEX I; AND

2. YOU OWN, TOGETHER WITH YOUR AFFILIATES, IN EXCESS OF $5,600,000.00 OR 2% OF THE PRINCIPAL AMOUNT OF THE SENIOR UNSECURED NOTES ISSUED UNDER THE SENIOR UNSECURED NOTES INDENTURE.

IF YOU DO NOT SATISFY THE PRECEDING CRITERIA, YOU ARE NOT ABLE TO PARTICIPATE AND YOU SHOULD NOT FILL OUT THE SUBSCRIPTION FORM OR SEND ANY MONEY TO THE SUBSCRIPTION AGENT (AS DEFINED BELOW).

IF YOU ELECT TO PARTICIPATE AS A LENDER IN THE TERM LOAN, YOU WILL BE ENTERING INTO A BINDING LEGAL COMMITMENT WITH FORBES ENERGY SERVICES LTD. (THE "COMPANY").  THIS OPPORTUNITY IS NOT BEING GIVEN TO ANY PERSON IN ANY JURISDICTION IN WHICH THE ACCEPTANCE OF THE OPPORTUNITY OR MAKING AN OFFER IN CONNECTION THEREWITH WOULD NOT BE IN COMPLIANCE WITH THE LAWS OF SUCH JURISDICTION.

### EXPIRATION TIME

YOUR OPPORTUNITY TO ELECT TO BECOME A LENDER IN THE TERM LOAN WILL EXPIRE AT 5:00 P.M., NEW YORK CITY TIME, ON JANUARY 25, 2017 UNLESS EXTENDED OR EARLIER TERMINATED BY MUTUAL AGREEMENT OF THE COMPANY AND THE REQUIRED BACKSTOP LENDERS (AS SUCH TERM IS DEFINED IN THE BACKSTOP AGREEMENT (AS DEFINED BELOW)) (SUCH DATE AND TIME, AS THE SAME MAY BE EXTENDED, THE "EXPIRATION TIME").

THERE ARE NO WITHDRAWAL RIGHTS ONCE THE SUBSCRIPTION FORM ATTACHED TO THIS NOTICE AND INSTRUCTION FORM IS VALIDLY DELIVERED OR YOU HAVE FUNDED YOUR ENTIRE PARTICIPATION AMOUNT INTO THE FUNDING ACCOUNT, INCLUDING IN THE EVENT OF A MATERIAL CHANGE IN THE TERMS OF THE FUNDING OPTION. IF THE COMPANY AND THE REQUIRED BACKSTOP LENDERS MUTUALLY DETERMINE TO ALLOW YOU TO WITHDRAW YOUR COMMITMENT, ANY SUCH WITHDRAWAL WILL BE LIMITED AS SET FORTH IN ANY NOTICE THEREOF.

YOUR SUBSCRIPTION DOCUMENTS MUST BE RECEIVED BY YOUR NOMINEE IN SUFFICIENT TIME TO ALLOW YOUR NOMINEE TO COMPLETE THE CERTIFICATION OF HOLDINGS, ATTACHED HERETO AS ANNEX II-A (THE "CERTIFICATION OF HOLDINGS"), ON YOUR BEHALF AND DELIVER ALL SUBSCRIPTION DOCUMENTS TO THE SUBSCRIPTION AGENT BY THE EXPIRATION TIME.

NO SUBMISSION OF A SUBSCRIPTION FORM OR RELATED SUBSCRIPTION DOCUMENTS WILL BE VALID IF DELIVERED AFTER THE EXPIRATION TIME. THE COMPANY AND THE REQUIRED BACKSTOP LENDERS WILL MUTUALLY AND REASONABLY DETERMINE WHETHER A SUBSCRIPTION FORM TRANSMITTING AN ELIGIBLE OFFEREE'S (AS DEFINED BELOW) COMMITMENT TO PARTICIPATE IN THE TERM LOAN AND RELATED SUBSCRIPTION DOCUMENTS HAVE BEEN VALIDLY SUBMITTED AND WHETHER TO ACCEPT ANY SUBSCRIPTION DOCUMENT THAT HAS NOT BEEN VALIDLY EXECUTED AND DELIVERED.

To the Senior Unsecured Noteholders:

      Forbes Energy Services Ltd., a Texas corporation (the "<u>Company</u>"), and certain of its subsidiaries (together with the Company, each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") intend to file voluntary petitions for relief (the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division (the "<u>Bankruptcy Court</u>").  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in that certain Backstop Agreement among the Company and the Backstop Lenders dated as of December 21, 2016 (the "<u>Backstop Agreement</u>").

      Certain Senior Unsecured Noteholders have entered into a Restructuring Support Agreement dated as of December 21, 2016 (the "<u>Restructuring Support Agreement</u>"), pursuant to which such parties have agreed to, among other things, vote in favor of a pre-packaged plan of reorganization to be filed in connection with the Chapter 11 Cases and attached as Exhibit A to the Restructuring Support Agreement (the "<u>Plan</u>").  Subject to, among other things, the Bankruptcy Court's entry of an order confirming the Plan (the "<u>Confirmation Order</u>") and consummation of the Plan, the Company proposes to enter into the Credit Agreement for a new first lien term loan (the "<u>Term Loan</u>") in an aggregate principal amount of $50,000,000 (the "<u>Term Loan Amount</u>").

      The Company proposes to offer each Senior Unsecured Noteholder who (i) is an accredited investor and (ii) owns, together with its affiliates, in excess of $5,600,000.00, or 2%, of the principal amount of the Senior Unsecured Notes outstanding the option to fund (the "<u>Funding Option</u>") such Eligible Offeree's pro rata portion of the Term Loan subject to the procedures and documentation detailed herein.  In order to facilitate the Funding Option, and subject to the terms, conditions and limitations set forth in the Backstop Agreement, each Backstop Lender, severally and not jointly, has agreed to fund, on the effective date of the Plan, such Backstop Lender's percentage of the aggregate principal amount of the Term Loan minus the aggregate principal amount of Term Loan funded pursuant to the Funding Option on or before the Expiration Time.

      You have received this Notice and Instruction Form because, as of December 19, 2016 (the "<u>Record Date</u>"), you were a Senior Unsecured Noteholder.  Accordingly, you are being given notice of your opportunity to be a lender in the Term Loan on the terms and subject to the conditions set forth in this Notice and Instruction Form.

      Notwithstanding the foregoing, only persons or entities that (i) were Senior Unsecured Noteholders as of the Record Date; (ii) are "accredited investors" as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended; and (iii) own, together with their affiliates, in excess of $5,600,000.00, or 2%, of the principal amount of the Senior Unsecured Notes outstanding (each, an "<u>Eligible Offeree</u>" and collectively, the "<u>Eligible Offerees</u>"), are eligible to participate in the Funding Option.

      Please use the subscription form attached hereto as Annex II (the "<u>Subscription Form</u>") to transmit your elections, if any. To participate in the Funding Option, you must, on or prior to **5:00 p.m., New York City time, on January 25, 2017** (the "<u>Expiration Time</u>"): (i) complete and execute (a) the Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), (b) the signature page to the Credit Agreement attached to the Subscription Form, (c) the Administrative Questionnaire attached to the Subscription Form, and (d) such other documents as the Subscription Agent or the administrative agent under the Credit Agreement (the "<u>Administrative Agent</u>") may reasonably require (collectively, the "<u>Subscription Documents</u>"); (ii) deliver (or cause the delivery of) such Subscription Documents to your nominee in sufficient time to allow your nominee to complete the Certification of Holdings on your behalf and deliver all Subscription Documents to Wilmington Trust, National Association (the "<u>Subscription Agent</u>") as instructed below; and (iii) fund your entire Participation Amount, as indicated in Item 4 of the Subscription Form (the "<u>Subscription Funding</u>"), in each case as further described herein.  If you are an Eligible Offeree and your Senior Unsecured Notes are held through more than one nominee, please have each nominee complete a nominee certification of holdings for the respective Senior Unsecured Notes held.

      The Credit Agreement (without schedules or exhibits), as well as the Backstop Agreement, the Plan and other related documents may be obtained by: (i) accessing the Debtors' restructuring website at http://www.kccllc.net/forbes; (ii) calling the Debtors' voting agent, Kurtzman Carson Consultants LLC, at (877) 634-7165 (toll free) or +1 (424) 236-7221 (international); or (iii) emailing ForbesEnergyInfo@kccllc.com.

      The Term Loan will mature four (4) years after the effective date of the Plan (the "<u>Effective Date</u>").  Interest on the Term Loan will accrue (a) at an annual rate of five percent (5%) in cash and (b) at an annual rate of seven percent (7%) either payable in cash or capitalized and added to the principal at the option of the Company ("<u>PIK Interest Rate</u>"), *provided*, that the PIK Interest Rate shall increase by two percent (2%) every twelve (12) months after the Effective Date.  The entire amount of the Term Loan, together with accrued and unpaid interest thereon, shall be due and payable in full at maturity.

      ***The foregoing description of the Term Loan is a summary only and does not purport to be complete.  It is subject to and qualified in its entirety by reference to the Credit Agreement.***

Your portion of the Subscription Funding, representing your Pro Rata Share of the Term Loan (subject to the Funding Fee as described below), will be held by the Subscription Agent in the Funding Account (as defined below) for an undetermined period of time and there can be no assurances as to when the closing of the Funding Option will occur.

For purposes of the Funding Option, each Eligible Offeree's pro rata share ("Pro Rata Share") shall be equal to a fraction (expressed as a factor) the numerator of which is the aggregate principal amount of all Senior Unsecured Notes held by such Eligible Offeree as of the Record Date and the denominator of which is the aggregate outstanding principal amount of all Senior Unsecured Notes as of the Record Date, which amount is equal to two hundred and eighty million dollars ($280,000,000.00).

Each Eligible Offeree who participates in the Funding Option will receive its Pro Rata Share of the Funding Fee of three million dollars ($3,000,000.00).  Each Eligible Offeree's total Subscription Funding shall be equal to its Subscription Funding minus its Pro Rata Share of the Funding Fee (as calculated in Item 4 of the Subscription Form).

A commitment to participate in the Funding Option may not be withdrawn by you, unless otherwise mutually determined by the Company and the Required Backstop Lenders.  Your participation in the Funding Option is subject to you and your nominee providing all documents required by the Subscription Agent and the Subscription Agent's satisfactory review of such information and documents (subject to the further review and approval of the Required Backstop Lenders as set forth below).

The Company and the Required Backstop Lenders mutually and reasonably will determine whether any Holder is an Eligible Offeree, has properly executed and delivered the required documentation, and funded its proposed amount of the Subscription Funding and whether to reject or accept any subscription to participate that has not been properly completed and delivered.  In furtherance of such determinations, the Subscription Agent shall promptly provide copies of any Subscription Documents received by the Subscription Agent to counsel for the Company and the Required Backstop Lenders.  If counsel for the Company or the Required Backstop Lenders notifies the Subscription Agent that any such Subscription Documents have been improperly executed or of any other defects or irregularities in the completion of such Subscription Documents, the Subscription Agent shall, at the request of counsel for the Company or the Required Backstop Lenders, use commercially reasonable efforts to inform the applicable Senior Unsecured Noteholder of such defect or irregularity.  In the event that any Eligible Offeree has funded an amount greater than its Subscription Funding, the Subscription Agent shall wire transfer the amount of such overfunding, as instructed by counsel for the Company or the Required Backstop Lenders, to the account of the Eligible Offeree identified for that purpose in the Subscription Documents.

Each Eligible Offeree that intends to participate in the Funding Option as a lender in the Term Loan must, prior to the Expiration Time, (i) deliver (or cause the delivery of) the duly executed Subscription Documents to your nominee in sufficient time to allow your nominee to complete the Certification of Holdings on your behalf and deliver all Subscription Documents to the Subscription Agent, and (ii) cause the amount of the Subscription Funding to be funded by such Eligible Offeree to be sent by wire transfer of immediately available federal funds to an account (the "Funding Account") established by the Subscription Agent, according to the wire instructions below:

> Wilmington Trust
> Wilmington DE
> ABA No. 031-100-092
> Account No. 119548-000
> Re:  Forbes Energy Subscription Agent
> Attn:  Corporate Capital Markets/Joseph Clark

Funds held in the Funding Account will not accrue interest.  The Subscription Agent assumes no responsibility for the funds delivered to the Funding Account and shall be entitled to rely solely on the direction of the Company or the Required Backstop Lenders as set forth in this document or the other documents governing the rights and duties of the Subscription Agent in connection with the Funding Account, with respect to the disposition of such funds.

Upon closing of the Funding Option, the Subscription Agent will, promptly upon receipt of written instructions from the Company in the form of a funds flow memorandum, which memorandum shall be subject to the review and approval of counsel for the Required Backstop Lenders, disburse the funds in the Funding Account funded by participating Eligible Offerees in accordance with such instructions and, within three (3) days of the Effective Date, refund any unused funds, if any, in accordance with such instructions to the refund account identified on the applicable Subscription Form.

**Before you deliver the executed Subscription Documents and wire funds to the Funding Account, please carefully review the Credit Agreement, the Plan and all documentation included with the solicitation materials with respect to the Plan.**

Participating as a lender in the Term Loan entails risks, including, but not limited to, the risk that the Company may be liquidated or may be unsuccessful in executing its business plan, and as a result may be unable to repay all or part of the obligations under the Term Loan.

Notwithstanding anything to the contrary herein, the Required Backstop Lenders and the Company may amend or modify the terms of the Funding Option, including the Subscription Form and/or the other Subscription Documents, at any time; provided that nothing in this Notice and Instruction Form shall be construed to supersede the amendment and modification requirements set forth in the Credit Agreement; provided further that the terms of the Funding Option, including the Subscription Form and/or the other Subscription Documents may not be amended in a manner that materially affects the rights or duties of the Subscription Agent without the Subscription Agent's written consent.

**ANNEX I TO**
**NOTICE AND INSTRUCTION FORM**

**DEFINITION OF ACCREDITED INVESTOR**

As "accredited investor," as defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "Act"), is an investor who meets any one or more of the following criteria:

(i)    a natural person whose individual net worth, or joint net worth with that person's spouse, at the time of his or her purchase exceeds $1,000,000;

(ii)    a natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year; or

(iii)    A bank, as defined in section 3(a)(2) of the Act, or a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act, whether acting in its individual or fiduciary capacity; a broker dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended; an insurance company, as defined in Section 2(13) of the Act; an investment company registered under the Investment Company Act of 1940, as amended (the "1940 Act") or a "business development company," as defined in Section 2(a)(48) of the 1940 Act; a Small Business Investment Company licenses by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, if such plan has total assets in excess of $5,000,000; or an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of ERISA, that is either a bank, savings and loan association, insurance company or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000, or if a self-directed plan, with investment decisions made solely by persons that are accredited investors;

(iv)    private business development company, as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

(v)    A corporation, an organization described in Section 501(c)(3) of the Internal Revenue code of 1986, as amended (the "Code"), a Massachusetts or similar business trust, or a partnership, not formed for the specific purpose of acquiring the securities offered, in each case with total assets in excess of $5,000,000;

(vi)    Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(vii)    A trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Act; or

(viii)    Any entity in which all of the equity owners are accredited investors.

For purposes of calculating net worth under (i) above, (a) a person's primary residence shall not be included as an asset; (b) indebtedness that is secured by a person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of the sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (c) indebtedness that is secured by a person's primary residence in excess of the estimated fair market value of the primary residence shall be included as a liability.

**ANNEX II TO**
**NOTICE AND INSTRUCTION FORM**

**FORBES ENERGY SERVICES LTD.**

**SUBSCRIPTION FORM**

---

**IMPORTANT**

**PLEASE READ THE FOLLOWING AND THE ATTACHED INSTRUCTIONS CAREFULLY.  ON OR BEFORE THE EXPIRATION TIME, YOU MUST (I) COMPLETE, SIGN, DATE AND DELIVER THIS SUBSCRIPTION FORM AND THE OTHER SUBSCRIPTION DOCUMENTS ANNEXED HERETO TO YOUR NOMINEE IN SUFFICIENT TIME TO ALLOW YOUR NOMINEE TO COMPLETE THE CERTIFICATION OF HOLDINGS ON YOUR BEHALF AND DELIVER ALL SUBSCRIPTION DOCUMENTS TO THE SUBSCRIPTION AGENT AND (II) FUND YOUR ENTIRE PARTICIPATION AMOUNT (AS SPECIFIED IN ITEM 4 BELOW) BY WIRING FUNDS TO THE FUNDING ACCOUNT.**

**IF ANY SUCH SUBSCRIPTION DOCUMENTS ARE NOT COMPLETED, SIGNED AND RECEIVED BY THE SUBSCRIPTION AGENT ON OR BEFORE THE EXPIRATION TIME, AND/OR YOUR ENTIRE PARTICIPATION AMOUNT IS NOT RECEIVED IN THE FUNDING ACCOUNT ON OR BEFORE THE EXPIRATION TIME, THE INSTRUCTION TRANSMITTED BY THIS SUBSCRIPTION FORM MAY NOT BE COUNTED.**

**YOU SHOULD REVIEW THE CREDIT AGREEMENT, THE PLAN, ALL DOCUMENTATION INCLUDED WITH THE SOLICITATION MATERIALS WITH RESPECT TO THE PLAN, THE NOTICE AND INSTRUCTION FORM AND THE INSTRUCTIONS CONTAINED HEREIN BEFORE YOU ELECT TO PARTICIPATE IN THE OPPORTUNITY. YOU MAY WISH TO SEEK LEGAL AND/OR FINANCIAL ADVICE CONCERNING THE FUNDING OPTION.**

---

Capitalized terms used herein but not defined herein have the meanings ascribed to them in the Backstop Agreement dated as of December 21, 2016.

**Item 1.  Holdings**.  The undersigned hereby represents that, as of December 19, 2016 (the "Record Date"), the undersigned is owner of the following:

| A | B | C |
|---|---|---|
| Name/Address | Total Principal Amount of Senior Unsecured Notes as of the Record Date | Total Percentage Owned of Senior Unsecured Notes as of the Record Date |
| | | $<br>(Insert total amount from Column B)<br><br>Divided by $280,000,000<br><br>=<br>(Item 1(C) – Total percentage owned of Senior Unsecured Notes) |

**Item 2.  Representations of the Holder**.  The undersigned hereby represents that it:

- is an "accredited investor" as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended;

- owns, together with its affiliates, in excess of $5,600,000.00, or 2%, of the principal amount of the Senior Unsecured Notes outstanding;

- is sophisticated with respect to the decision to participate as a lender in a commercial loan of the type represented by the Term Loan and is, or the entity exercising discretion in making this decision to participate in the Funding Option, experienced in participating as a lender in such commercial loans;

- has received and/or reviewed the Credit Agreement, the Plan, all documentation included with the solicitation materials with respect to the Plan and has received, or has been afforded the opportunity to receive or have access to, to the extent available, copies of the most recent annual and quarterly financial statements of the Debtors and such other documents and information as it deems appropriate to make its own credit analysis and decision to participate in the Funding Option; and

- has (i) independently and without reliance on any other participant as a lender in the Term Loan or on the Debtors or any trustee or administrative agent under the Indenture or the Credit Agreement, and (ii) based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to participate in the Funding Option.

In the event that the undersigned is unable to answer in the affirmative any of the representations in Items 1 and 2, the undersigned is unable to participate in the Funding Option.

**Item 3.  Participation in the Funding Option**.  You are entitled to participate in the Funding Option in an amount not less than your pro rata share of Senior Unsecured Notes as of the Record Date as set forth in Item 1(C).

**Item 3A: Subscription Amount**

_____[1]     x     $50,000,000 =          $_____
(Item 3(A) – Your "**Total Subscription Participation Amount**")

**Item 3B: Funding Fee**

_____[2]     x     $3,000,000 =          $_____
(Item 3(B) – Your "**Total Funding Fee Amount**")

---

[1]     Fill-in Total Percentage Owned of Senior Unsecured Notes from Item 1(C) above.
[2]     Fill-in Total Percentage Owned of Senior Unsecured Notes from Item 1(C) above.

**Item 4.  Total Funding Amount**.

| Total Funding Amount | |
|---|---|
| Item 3(A): Total Subscription Participation Amount | $ |
| Item 3(B): Total Funding Fee Amount | $ |
| Item 4: Total Funding (Item 3(A) **minus** Item 3(B)) | $ |

**Item 5.  Certification**.  By signing this Subscription Form, the undersigned (i) certifies that it understands that the option to participate in the Funding Option is subject to all the terms and conditions set forth in the Notice and Instruction Form, (ii) certifies that each of the representations set forth in Item 2 is true and (iii) agrees that the commitment to participate in the Term Loan constitutes an irrevocable commitment by the undersigned to fund the Term Loan up to the amount so specified.  The undersigned agrees to provide all of the items set forth in the Notice and Instruction Form.

Name of Eligible Offeree: _____
                         (Print or Type)

U.S. Federal Tax I.D. No.(optional for Non-U.S. persons): _____
                         (If Applicable)

If U.S. person, check here and attach IRS Form W-9   ☐

If Non-U.S. person, check here and attach appropriate IRS Form W-8   ☐

Signature: _____

Print Name: _____

Title: _____

Facsimile Number: _____

E-Mail Address: _____

Street Address: _____

City, State, Zip Code: _____

Telephone: _____

Date Completed: _____

Wire Information (in the event a refund is needed):

| | |
|---|---|
| Account Name: | |
| Bank Account No.: | |
| ABA/Routing Number: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | |

**THE SUBSCRIPTION DOCUMENTS, INCLUDING YOUR NOMINEE'S CERTIFICATION OF HOLDINGS, MUST BE RECEIVED BY THE SUBSCRIPTION AGENT AT ITS EMAIL ADDRESS LISTED BELOW AND THE AMOUNT OF YOUR TOTAL FUNDING (ITEM 4) MUST BE TRANSFERRED TO THE FUNDING ACCOUNT BEFORE 5:00 P.M., NEW YORK CITY TIME, ON JANUARY 25, 2017, OR THE INSTRUCTIONS TRANSMITTED HEREBY MAY NOT BE COUNTED.**

Wilmington Trust, National Association
Telephone: (212) 941-4439
Email: jhclark@wilmingtontrust.com
Attention: Joseph Clark

ANNEX II-A TO
NOTICE AND INSTRUCTION FORM

**FORBES ENERGY SERVICES LTD.**

**NOMINEE'S CERTIFICATION OF HOLDINGS**

<u>Your ownership of Senior Unsecured Notes must be confirmed in order to participate in the Funding Option</u>.

The nominee holding your Senior Unsecured Notes as of 5:00 p.m., New York City time, on December 19, 2016, must complete Box A on your behalf and complete Box C.  Box B is only required if any or all of your Senior Unsecured Notes were on loan as of 5:00 p.m., New York City time, on December 19, 2016 (as determined by your nominee).

| Box A<br>For Use by the Nominee | Box B<br>Nominee Proxy—Only if Needed |
|---|---|
| DTC Participant Name:     _____<br><br>DTC Participant Number:     _____<br><br><br>Principal Amount of Senior Unsecured Notes (CUSIP No. 345143 AC 5) held by this account as of 5:00 p.m., New York City time, on December 19, 2016<br><br>$_____ principal amount<br><br>Nominee authorized signatory: _____<br><br>Nominee contact name: _____<br><br>Nominee contact email: _____<br><br>Contact telephone number: _____<br><br>Beneficial Holder name: _____ | DTC Participant Name:     _____<br><br>DTC Participant Number:     _____<br><br><br>Principal Amount of Senior Unsecured Notes (CUSIP No. 345143 AC 5) held by this account as of 5:00 p.m., New York City time, on December 19, 2016<br><br>$_____ principal amount<br><br>Nominee authorized signatory: _____<br><br>Nominee contact name: _____<br><br>Nominee contact email: _____<br><br>Contact telephone number: _____<br><br>Beneficial Holder name: _____ |

| Box C<br>For Use Only by the Nominee<br>MEDALLION GUARANTEE:<br>(In lieu of providing a medallion stamp, a Nominee may provide a notarized signature on this Nominee's Certification Of Record Date Holdings<br>and a list of authorized signatories on the letterhead of the Nominee.) |
|---|
|  |

ANNEX II-B TO
NOTICE AND INSTRUCTION FORM

FORBES ENERGY SERVICES LTD.

INSTRUCTIONS FOR COMPLETING SUBSCRIPTION FORM

**EXPIRATION TIME/SUBSCRIPTION AGENT:**

The Expiration Time for participation in the Funding Option is **5:00 p.m., New York City Time, on January 25, 2017** unless extended or earlier terminated. To elect to participate in the Funding Option, you must complete, sign, and return this Subscription Form and the other Subscription Documents to your nominee in sufficient time to allow your nominee to complete the Certification of Holdings on your behalf and deliver electronic copies of all Subscription Documents to the Subscription Agent at the following email address for receipt by the Subscription Agent no later than the Expiration Time:

**Wilmington Trust, National Association**
**Telephone: (212) 941-4439**
**Email: jhclark@wilmingtontrust.com**
**Attention: Joseph Clark**

To effect a subscription, you must take the following steps:

1. Complete Item 1 of the Subscription Form.

2. Review the representations in Item 2 of the Subscription Form.  In order to participate in the Funding Option, each of the representations set forth in Item 2 must be correct.

3. In Item 3 of the Subscription form, calculate the Total Subscription Participation Amount and the Total Funding Fee Amount.

4. Calculate the Total Funding Amount in Item 4.

5. Review the certification item in Item 5 of the Subscription Form.

6. Complete Item 5 of the Subscription Form.

7. Deliver the following items to your nominee in sufficient time to allow your nominee to complete the Certification of Holdings on your behalf (Annex II-A) and deliver electronic copies of all Subscription Documents to the Subscription Agent by email on or before the Expiration Time:

    a. The Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable).

    b. The Total Funding Amount (Item 5) to be wired to the following Funding Account:

       Wilmington Trust
       Wilmington, DE
       ABA No. 031-100-092
       Account No. 119548-000
       Re: Forbes Energy Subscription Agent
       Attn:  Corporate Capital Markets/Joseph Clark

    c. Executed signature page to the Credit Agreement for the Term Loan (Annex II-C).

    d. Completed Administrative Questionnaire for the Term Loan (Annex II-D).

    e. Any other documentation requested by the Subscription Agent or the Administrative Agent.

**PLEASE NOTE:**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS SUBSCRIPTION FORM, ANY OTHER SUBSCRIPTION DOCUMENT OR THE PROCEDURES RELATED HERETO, PLEASE CALL THE SUBSCRIPTION AGENT, WILMINGTON TRUST, NATIONAL ASSOCIATION, ATTENTION JOSEPH CLARK, AT 212-941-4439.**

**Your participation in the Funding Option is subject to you providing all information and other documents required by the Subscription Agent and the Subscription Agent's satisfactory review of such information and documents (as determined in the sole discretion of the Subscription Agent).**

**Forbes Energy Services Ltd., along with certain affiliates, intends to file a voluntary petition for relief under chapter 11 of the Bankruptcy Code and expects to operate its business and manage its property as a debtor-in-possession pursuant to the Bankruptcy Code.**

**This Notice and Instruction Form and any exhibits thereto shall not constitute or be deemed to constitute a solicitation by any party of votes to approve or reject a Chapter 11 plan for any debtor.  A solicitation with respect to votes to approve or reject a Chapter 11 plan is being conducted concurrently through a disclosure statement that complies with section 1125 of the Bankruptcy Code.**

**ANNEX II-C TO**
**NOTICE AND INSTRUCTION FORM**

**Signature Page to Term Loan**

<u>LENDER:</u>

SENIOR UNSECURED NOTEHOLDER

_____
Entity Name

By: _____
     Name:
     Title:

**ANNEX II-D TO**
**NOTICE AND INSTRUCTION FORM**

# ADMINISTRATIVE QUESTIONNAIRE

| Deal Name: | | | |
|---|---|---|---|
| **Agent Address:** | Wilmington Trust, N.A | **Return To:** | Loan Agency Middle Admin |
| | 50 South Sixth Street | **Phone:** | 612-217-5649 |
| | Suite 1290 | **Fax:** | 612-217-5651 |
| | Minneapolis, MN 55402 | **E-mail:** | LoanAgency@WilmingtonTrust.com |

## LENDER INFORMATION:

| | |
|---|---|
| **Legal Name of Lender:** | |
| **Legal Address:** | |
| **Fund Manager:** | |
| | |

## ADMINISTRATIVE/OPERATIONS/NOTICES CONTACTS:

| | Primary Contact | Secondary Contact |
|---|---|---|
| **Name:** | | |
| **Company:** | | |
| **Title:** | | |
| **Address:** | | |
| | | |
| | | |
| | | |
| **Phone:** | | |
| **Fax:** | | |
| **E-Mail Address:** | | |

## CREDIT CONTACTS:

| | Primary Contact | Secondary Contact |
|---|---|---|
| **Name:** | | |
| **Company:** | | |
| **Title:** | | |
| **Address:** | | |
| | | |
| | | |
| | | |
| **Phone:** | | |
| **Fax:** | | |
| **E-Mail Address:** | | |

## INTRALINKS CONTACTS:

| | |
|---|---|
| **Name:** | |
| **Phone:** | |
| **E-mail Address:** | |
| | |
| **Name:** | |
| **Phone:** | |
| **E-mail Address:** | |
| | |
| **Name:** | |
| **Phone:** | |
| **E-mail Address:** | |

## DOMESTIC WIRE INSTRUCTIONS:

| | |
|---|---|
| **Currency:** | |
| **Bank Name:** | |
| **Swift/Routing No.:** | |
| **Account Name:** | |
| **Account No.:** | |
| **FCC Account Name:** | |
| **FCC Account No.:** | |
| **Attention:** | |

## FOREIGN WIRE INSTRUCTIONS:

| | |
|---|---|
| **Currency:** | |
| **Bank Name:** | |
| **Swift/Routing No.:** | |
| **Account Name:** | |
| **Account No.:** | |
| **FCC Account Name:** | |
| **FCC Account No.:** | |
| **Attention:** | |
| **Reference:** | |

## TAX FORM PROVIDED:

**W-9** ☐
**W-8BEN** ☐
**W-8IMY** ☐
**W-8ECI** ☐
**W-8EXP** ☐
**Other** ☐

## Schedule 7(u)(i)

## Personal Property

Subject to the provisions of that certain Loan and Security Agreement, dated September 9, 2011 (as so amended and as at any time further amended, modified, restated or supplemented, the "***Loan Agreement***") among Forbes Energy Services LLC ("***Energy Services***"), TX Energy Services, LLC ("***TX Energy***"), C.C. Forbes, LLC, as successor by merger to Superior Tubing Testers, LLC ("***CC***"), and Forbes Energy International, LLC ("***FEI***," and together with Energy Services, TX Energy and CC, the "***Borrowers***"), the Company, the lenders party thereto, and Regions Bank, as agent for such lenders and other secured parties, the loans and extensions of credit made pursuant to the Loan Agreement are secured by first priority, perfected security interests in and other liens in substantially all of the assets of Borrowers.